FARMERS UNION GRAIN TERMINAL
ASSOCIATION, Plaintiff/Appellee,

v.

Byron NELSON, Defendant/Appellant.

Civ. No. 9018.

Supreme Court of North Dakota.

Oct. 31, 1974.

Rehearing Denied Dec. 4, 1974.
As Modified Dec. 4, 1974.

495

Ohnstad, Twichell, Breitling, Arntson & Hagen, West Fargo, for defendant/appellant.

Pringle & Herigstad, Minot, for plaintiff/appellee.

JOHNSON, Judge.

This case involves two grain purchase contracts dated September 19, 1972, be-

tween Byron Nelson, a Hamberg, North Dakota, farmer, and the Farmers Union Grain Terminal Association, a cooperative marketing association with headquarters at Minneapolis, Minnesota (GTA). The contracts were printed forms prepared by GTA for the use of its "line" elevators. Under the terms of the contracts Nelson agreed to deliver 17,000 bushels of durum at $1.96 per bushel, and 47,000 bushels of hard wheat at $2.00 per bushel to the GTA-owned elevator at Hamberg, North Dakota. Each contract contained the following clause:

> "I agree to deliver said grain to Farmers Union Grain Terminal Association at its elevator at Hamberg, State of North Dakota, on or before 03 30, 1973 provided space is available to receive and store the same, and if not, as soon thereafter as space is available, and I agree that time is of the essence of this contract as to the delivery of said grain."

During November of 1972 and February of 1973 Nelson made partial deliveries of grain to the Hamberg elevator, totaling some 19,847.5 bushels. In March of 1973 he received two advances of $10,000 each as prepayments on the grain contracts. Nelson made a series of inquiries during the first part of the year as to when he could deliver the contracted grain yet in his possession but was informed each time that, due primarily to its inability to obtain a sufficient number of boxcars to make space available, the Hamberg elevator was unable to accept delivery. There was evidence that during the same period the elevator was purchasing substantial amounts of non-contracted or cash grain. In addition, the elevator had entered into a considerable number of other contracts for delivery of grain during this period. Nelson subsequently became heavily engaged in spring planting operations.

On June 6, 1973, the manager of the Hamberg elevator attempted to notify Nelson that he could commence hauling the grain yet to be delivered under his contracts. This message was not received by Nelson until the morning of June 9, and the evidence is conflicting as to whether he was told he could not deliver grain on that date. On June 13, 1973, Nelson notified the Hamberg elevator that he would not deliver the grain remaining under contract but would deliver it to another elevator. At the time he gave notice of his intentions, Nelson tendered a check payable to GTA in the sum of $26,555.05. This check represented a return of the $20,000 previously advanced, interest on that amount at the rate of five-sixths percent per month on the unpaid balance for the months of April and May, and the difference between the contract price and the market price on March 30, 1973.

Each of the grain purchase contracts in question contain the following clause regarding damages:

> "In case of default in the delivery of said grain, then and in that event, I agree to pay to Farmers Union Grain Terminal Association, as liquidated damages, the difference between the contract price herein and the market price of grain of like grade at the close of the market at the Minneapolis Grain Exchange on the 30th day of March, 1973, after making due deductions for freight from the above station to Minneapolis, Minnesota."

GTA refused the tender of damages and sued Nelson for the advances, plus damages based upon June 13 market prices which were substantially higher than the market on March 30. The matter was tried before a jury in the Wells County District Court, Fourth Judicial District, Judge Alfred A. Thompson, presiding. The jury found for GTA in the sum of $6,320.34 and awarded Nelson the sum of $220.76 as damages for storage of grain. Motions for judgments notwithstanding the verdict were made by both parties. The motion of GTA was granted. The court set aside the damages awarded to Nelson for grain storage and increased the award to GTA to the sum of $28,904.55.

## I.

The primary dispute concerns the measure of damages to GTA for breach or cancellation of the contracts. Nelson is prepared to accept the damages formula specified under the contracts—the difference between the contract price and the market price on March 30. However, GTA contends that it is entitled to damages based upon market prices on June 13 when Nelson repudiated the contracts. The market prices on that date were substantially higher. Under the March 30 prices, the damages would be $6,220.34, while using June 13 prices results in damages of $28,904.55.

GTA relies primarily upon Section 41–02–98, N.D.C.C. (UCC 2–719), to sustain its position.

"1. Subject to the provisions of subsections 2 and 3 of this section and of the preceding section on liquidation and limitation of damages,

"a. the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

"b. *resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive,* in which case it is the sole remedy.

"2. *Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.*"

[Emphasis supplied.]

GTA takes the position that (1) the agreement does not specifically provide that the damage provision is exclusive and, therefore, it is not, and (2) even if the contract provision is exclusive it has failed "of its essential purpose" and therefore is ineffective under the statute. The trial court accepted this position and instructed the jury that it should not use the contract clause in determining damages. The jury apparently used the March 30 market prices nonetheless, and the trial court ordered judgment notwithstanding the verdict.

We do not agree with the conclusions of the trial court on this question.

■■■ There are two principles of contract interpretation which should be given special weight in this situation. (1) A contract is construed most strongly against the party who prepared it, and who presumably looked out for his best interests in the process. See Stuart v. Secrest, 170 N.W.2d 878 (N.D.1969); Shimek v. Vogel, 105 N.W.2d 677 (N.D.1960); Section 9–07–19, N.D.C.C. (2) An agreement which is essentially a "contract of adhesion" should be examined with special scrutiny by the courts to assure that it is not applied in an unfair or unconscionable manner against the party who did not participate in its drafting.

The traditional contract is a result of free bargaining between parties who are brought together by market conditions and who meet on a footing of approximate economic equality. In present-day commercial life, standardized, mass-produced contracts have appeared. These printed form agreements are used primarily by enterprises with strong bargaining power and position.

"The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood only in a vague way, if at all." Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract, 43 Colum.L.Rev. 629, 632 (1943).

See also, Ehrenzweig, Adhesion Contracts in the Conflict of Laws, 53 Colum.L.Rev.

1072 (1953); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); Bekken v. Equitable Life Assurance Society, 70 N.D. 122, 293 N.W. 200, 212 (1940). This is part of the background for the provisions of the Uniform Commercial Code regarding enforcement of unconscionable contract terms. See Section 2–302, U.C.C., and Official Comment, Section 41–02–19, N.D.C.C.

■ The clause regarding determination of damages in these contracts is designed to provide an agreed method of computing loss in the event of breach. See Section 41–02–97, N.D.C.C. (Section 2–718, U.C.C.) In the context of the agreement the clause appears clearly intended as an exclusive means of computing the loss in the event of failure to deliver. See 2 Anderson, 2d Ed., Uniform Commercial Code, § 2–719:6. For purposes of this action it may properly be construed against its author, GTA. It certainly is not a provision which was the subject of bargaining between GTA and Nelson.

■ There may or may not have been a mutual understanding to excuse a delay in taking delivery on the grain, but there was certainly no evidence of agreement on modification of the measure of damages. Mr. Nelson was entitled to rely on the measure of damages GTA had established under its form agreement. Taking the construction most favorable to the seller, we do not find that this clause had "failed of its essential purpose." While there had been a substantial increase in market price between March 30 and June 13 (some thirty-six cents a bushel for wheat and some seventeen cents a bushel for durum), that fact alone cannot be said to have caused the clause to have failed in its essential purpose. The clause was designed to provide a fixed date for determining damages in a market that varied from day to day. If Mr. Nelson had attempted to cancel the contract at an earlier time, when the market was lower than on March 30, it may be assumed that GTA would have claimed the March 30 market

price for its measure of damages. The agreement contemplated that delivery might take place before or after March 30. The actual financial consequences visited upon GTA in having to "cover itself" in the event of rescission by a seller are also dependent upon the rise or fall of the grain market and could vary substantially. It appears from the record that GTA resold the grain on contract and was required to "buy back" its contract. It cannot be said that the contract provision had "failed of its essential purpose" merely because it had become more onerous to one of the parties.

We hold that the trial court erred in instructing the jury that it could not apply the damage clause of the agreement, and in granting judgment notwithstanding the verdict for additional damages claimed.

## II.

■ A second issue presented by this appeal is whether GTA's failure to accept delivery was properly submitted to the jury. Nelson urges that GTA breached the contracts by failing to take timely delivery in that it had contracted for too much cash grain prior to the contracted grain. GTA responds that the real problem was an unusual railroad boxcar shortage and that much of the cash grain was on overruns in contract delivery and seed cleaning, which by common practice were always accepted.

There was evidence submitted by both parties on the actions of the elevator in contracting for grain deliveries, taking cash deliveries, and arranging grain shipments. We cannot say as a matter of law that GTA breached its contract by failing to accept timely delivery. The question was one for the jury under proper instruction. The trial court instructed the jury, in part:

"The Plaintiff is under a duty to exercise a reasonable amount of care and effort to provide space for Mr. Nelson's grain. In order to excuse the Plaintiff from accepting delivery on the date provided in the contract, the lack of available space must be beyond the power of the Plaintiff to

prevent. You are instructed that whether the Plaintiff used a reasonable amount of care in providing available space for the grain is to be determined by you on the basis of all of the evidence in this case. If the Plaintiff failed to use said reasonable amount of care, then it cannot recover damages from the Defendant for failing to deliver the grain after March 30, 1973."

Taken as a whole, the instructions appear to accurately cover the law regarding time of performance and default. See Sections 41–02–15, 41–02–26, 41–02–82, N.D.C.C.

■ The question was submitted on special verdict to the jury. While the form of special verdict may not have been satisfactory from Nelson's standpoint, it was not objected to nor was another special verdict requested. Under the circumstances, the finding upon the special verdict is binding. Rule 49, N.D.R.Civ.P.

### III.

■ As part of his counterclaim against GTA, Nelson set up damages for double the amount of finance charges under the federal truth in lending law (15 U.S.C., § 1601 et seq.). Nelson claims that the cash advances under the grain purchase contracts made by GTA were transactions subject to truth in lending disclosure requirements. At the close of the evidence, the trial court granted GTA's motion to dismiss this claim.

The purpose of the truth in lending legislation is stated in 15 U.S.C.A., § 1601:

"The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

Mr. Nelson received two separate advances of $10,000 each from GTA in March of 1973. These were clearly intended as advance payments on the grain to be later delivered. There was no discussion or agreement concerning payment of interest. Subsequently, GTA billed interest at five-sixths percent per month on these amounts. GTA has not pressed for such interest in this action, and its right to make such interest charge is very dubious. However, the grounds for a truth in lending claim seem equally dubious. It does not appear that this transaction comes within the scope of this statute and its supplemental regulations (12 CFR 226.1–226.1002) which are designed to cover consumer credit transactions. As contemplated by the Act, "the term 'credit sale' refers to any sale with respect to which credit is extended or arranged *by the seller*." 15 U.S.C.A., § 1602(g); see also, 12 CFR, § 226.2(n). [Emphasis supplied.] In this case the advances were granted by the purchaser. There is also evidence that the grain was actually owned by a partnership of which Mr. Nelson was a member, and partnership transactions are excluded from the Act (§§ 1602(c), 1603). Nelson has established no other specific basis to bring him within the terms of this Act.

### IV.

■ Nelson has objected to the inclusion of certain persons on the jury who may have been members of GTA. As a cooperative association, GTA gives memberships to persons who do business with it. There may be established by the cooperative some minimum business requirements for membership. The trial court indicated that it would permit a challenge as to a prospective juror who did business with the Hamberg GTA elevator but not as to persons having other dealings with GTA. Four women were seated on the jury who indicated that at some time in the past their husbands had done business with GTA.

The ground for challenge on which Nelson relies is set out in Section 28–14–06(5), N.D.C.C.:

"Interest on the part of the juror in the event of the action, or in the main question involved in the action, except his interest as a member or citizen of a municipal corporation;"

Nelson cites a South Dakota case involving a burglary of a local cooperative in support of his position. State v. Thomlinson, 78 S.D. 235, 100 N.W.2d 121 (1960).

As a practical matter, it would appear difficult to find a family in a rural community within this state who had never done business with a GTA-owned or associated facility. The scope of its operations would indicate little direct relationship between an individual lawsuit and a benefit or detriment to an individual member. A blanket disqualification for GTA members would not appear advisable, although it is unnecessary to reach that question here as the record in this case reflects only some previous business with GTA by the husbands of the jurors in question. The record is insufficient to sustain the challenge.

### V.

Part of Nelson's counterclaim was a claim for storage charges on 44,000 bushels of grain for the period after March 30. The evidence at trial showed he had been paid one cent per bushel per month on that grain by the Commodity Credit Corporation through May 28. Though the evidence also showed that the amount actually in storage was less than the remaining amount contracted for, the jury awarded damages for storage, apparently at one cent per bushel on the full amount claimed from May 28 to June 13. This was set aside by the trial court as part of its judgment notwithstanding the verdict.

We believe that the trial court was correct in concluding that the evidence did not establish any contract, implied or otherwise, for storage of such grain. See also, Section 60–02–18, N.D.C.C.

The jury found that GTA was entitled to recover the amount of its advances to Mr. Nelson on the contracts ($20,000) less $1,106 for grain delivered—a net sum of $18,894. Although there was no initial agreement regarding payment of any interest, GTA later billed interest on this sum at the rate of five-sixths percent per month. The trial court awarded interest on this amount at the rate of four percent from the date of the second advance on March 23. While interest at the legal rate may be charged against an indebtedness, the date from which such interest should be computed appears questionable in this case. We find that the appropriate date for the commencement of interest is June 13, the date on which the contract was repudiated. Section 32–03–04, N.D.C.C.

The judgment of the trial court is reversed and the case remanded for additional proceedings consistent with this opinion.

ERICKSTAD, C. J., and VOGEL, KNUDSON and PAULSON, JJ., concur.