**SAWYER FARMERS COOPERATIVE ASSOCIATION, a North Dakota Corporation of Sawyer, North Dakota, Plaintiff/Appellee,**

v.

**Henry LINKE, Defendant/Appellant.**

**Civ. No. 9103.**

Supreme Court of North Dakota.

June 24, 1975.

Jan M. Sebby, Pringle & Herigstad, Minot, for defendant and appellant.

Michael G. Sturdevant, Waldron, Kenner & Halvorson, Minot, for plaintiff and appellee.

PAULSON, Judge.

This is another in the continuing series of cases involving grain elevators, farmers, and grain purchase contracts and breach of such contracts due to rapidly rising market prices. In this case, the Sawyer Farmers Cooperative Association [hereinafter "the elevator"] sued Henry Linke, a farmer, for breach of a contract to sell to the elevator 5,000 bushels of durum wheat. Judgment was awarded the elevator by the Ward County District Court and Mr. Linke appeals.

On July 27, 1973, Mr. Linke contracted to sell to the elevator 5,000 bushels of durum wheat at a price of $4.85 per bushel. The contract, a printed form provided by the elevator and signed by Mr. Linke, stated, in pertinent part:

"I Henry Linke do hereby sell and agree to deliver Sawyer N D or their agent, at their elevator, warehouse, or cribs, as they may designate, at Sawyer station, in Ward County, State of N D *between 27 day of July 1973 and the 1 day of October 1973*, (the date of such delivery to be at the buyer's option) 5000 bushels of good sound, dry and merchantable I–HAD to grade Dur for which I am to receive 4.85 per bushel;

(Write Price in Full)

said grain being now in my possession and free from all encumbrances of every nature I do furthermore agree that in case of default in the delivery of the grain at the date stipulated above, or at the date to which this contract may be extended by the buyer, to pay as liquidated damages for the violation of this contract the difference between the price

above stipulated and the highest market value of the same grain and grade *on date this contract is closed by the buyer, and the grain ordered in* or any date thereafter to which the time for delivery may have been extended by the buyer, as hereinafter specified; PROVIDED, however, that nothing herein shall be construed as to excuse the undersigned vendor from making delivery on the last date above mentioned, if no extension as hereinafter specified be granted." [Emphasis added.]

On or about August 15, 1973, Mrs. Henry Linke (appellant's wife) notified the elevator by telephone that Mr. Linke did not intend to make delivery under the terms of the contract. At this point the elevator neither accepted the repudiation nor did it attempt to avail itself of its remedies under the contract. The elevator's response to the repudiation was neither one of acceptance or rejection; rather, its response was one of silence. Later, on approximately October 1, 1973, the manager of the elevator contacted Mr. Linke and asked when delivery of the wheat would be made. Mr. Linke replied that the grain would not be delivered, thereby maintaining the position he had taken on August 15, 1973.

It is conceded by Mr. Linke, on appeal, that the contract in question was valid and that he breached such contract. The only issue before us is the ascertainment of the proper measure of damages to be awarded the elevator. In this regard, the trial court found that damages should be the difference between the contract price and the market price on August 15, 1973. Counsel for the elevator maintains that the trial court's determination is correct. Mr. Linke, relying upon our decision in Farmers Union Grain Terminal Association v. Nelson, 223 N.W.2d 494 (N.D.1974), contends that the last date of delivery, October 1, 1973, should be the date at which damages are computed. We conclude that the measure of damages should be the difference between the contract price and the market price on Au-

gust 15, 1973, and, accordingly, we affirm the judgment of the trial court.

As previously stated, Mr. Linke relies primarily, if not solely, upon Farmers Union Grain Terminal Association v. Nelson, *supra*, to support the proposition that the damages for a seller's breach of contract are to be determined as of the last date on which delivery may be made without default. Mr. Linke's reliance proves misplaced upon examination of the facts and opinion of *Nelson.*

In *Nelson*, the grain purchase contract provided that Mr. Nelson was to deliver a certain amount of grain to GTA "on or before 03 30, 1973". In case of default in delivery of the grain, Mr. Nelson agreed to pay to GTA:

"'. . . the difference between the contract price herein and the market price of grain of like grade at the close of the market at the Minneapolis Grain Exchange on the 30th day of March, 1973 . . . .'" *Nelson, supra* 223 N.W. at 496.

After offers by Nelson to deliver the grain prior to the March 30, 1973, due date, which offers were refused by GTA, the manager of the GTA elevator called for delivery in early June of 1973. On June 13, 1973, Nelson informed GTA that he would not deliver the grain, but would sell it to another elevator.

GTA contended that the damages for Mr. Nelson's breach should have been computed as of the date of Mr. Nelson's repudiation. We rejected that contention and held that March 30, 1973, was the significant date for the purpose of determining damages, stating in *Nelson, supra* 223 N.W.2d at 498:

"There may or may not have been a mutual understanding to excuse a delay in taking delivery on the grain, but there was certainly no evidence of agreement on modification of the measure of damages. . . . The [liquidated-damages] clause was designed to provide a fixed date for determining damages in a market that varied from day to day."

It may be seen from the above recitation that March 30, 1973, was held to be the significant date in *Nelson*, not because it was the last day for performance under the contract, but, rather because it was the date specified in the contract as being the date on which damages would be calculated in the event of a breach. Our holding in *Nelson* was simply that GTA was bound to abide by the explicit, unequivocal terms of its own form contract.

In the case at bar, unlike *Nelson*, the contract does not provide that damages are to be determined on a specified calendar date. The contract provides that damages are to be the difference between the contract price and the market price on the "date this contract is closed by the buyer, and the grain ordered in".

The argument is advanced by Mr. Linke that the grain was ordered in for the first time on October 1, 1973, and that the contract was, therefore, closed on that date. The grain may have been ordered in on October 1, 1973, but we do not view this act as determinative of the issue for we believe that the contract was closed prior to that date.

In most cases, the date on which grain is ordered in by the buyer, and the seller refuses to deliver, will be the date on which the contract is closed. We believe this to be the normal sequence of events, and that contemplated by the parties, but we do not view this as the exclusive method of closing the contract. In this case, where an anticipatory repudiation by the seller has occurred, application of the literal language of the clause would produce a most anomalous result. The buyer, after having been told by the seller that performance would not be forthcoming, could make demand for delivery only for the purpose of establishing the amount of damages to be received in the likely event that the seller will maintain his initial position and refuse to retract his repudiation. The contract before us need not be read so as to require this result.

■ We read the liquidated-damages clause of this contract to mean that damages are to be measured as of the date the contract is closed—by whatever method that closing is effected. We conclude that Mr. Linke breached, and thus closed, the contract on August 15, 1973, the date of the anticipatory repudiation. Although there is authority supporting the proposition that an anticipatory repudiation does not result in a breach of contract until accepted by the aggrieved party, and that the contract therefore remains in force until acceptance of repudiation [*see, e. g.*, the discussion in 4 Corbin on Contracts, § 981 (1951)], we find such authority to be unpersuasive. As stated by Professor Alphonse M. Squillante in his law review article, *Anticipatory Repudiation and Retraction*, 7 Valparaiso U.L.Rev. 373, at pages 381–382 (1973):

"The English courts have been the major advocates of the rule that repudiation is not a valid breach until accepted by the other party. The rationale for such a stance is simple enough: if one were to permit the breaching party to breach at his convenience, the result would be to give him the benefit of selecting the time to act or not to act based upon market conditions. This, of course, could work an intolerable hardship upon the non-breaching party. Therefore, if the non-breaching party is required to accept the breach as a condition of its validity, the benefit of choice would fall to the innocent party. Early American decisions followed this rule; however, newer cases have rejected it. These later cases are particularly well reasoned. The idea that an anticipatory repudiation is not a valid breach until accepted by the nonbreaching party originally came into being by confusing anticipatory repudiation with an offer, which it is definitely not." [Footnotes omitted.]

The view of Professor Squillante is shared by the American Law Institute. Section 318 of the Restatement of Contracts (1948 Supp.) states:

"In the case (1) of a bilateral contract that has not become unilateral by full performance on one side . . . any of the following acts, done without justification by a promisor in a contract . . constitutes an anticipatory repudiation which is a total breach of contract:

"(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties . . ."

In Comment a., following § 320 of the Restatement of Contracts (1932), which section deals with the effect of urging performance in spite of a repudiation, the position of the American Law Institute is again made clear:

"a. Although the effect of repudiation may be nullified . . . it operates until so nullified not only as a breach but as a continuing excuse of conditions . . .."

The Uniform Commercial Code also provides for a breach of contract by anticipatory repudiation, with no mention of a need for acceptance of the repudiation. For example, § 2–713, U.C.C. (§ 41–02–92, N.D.C. C.), provides that "the measure of damages for nondelivery or *repudiation* by the seller is the difference between the market price at the time when the buyer *learned of the breach* and the contract price . . .." [Emphasis supplied.]

 Thus, we find that acceptance of Mr. Linke's repudiation, by the elevator, in this case, was not necessary to effectuate a breach of contract. The contract was breached by the repudiation alone, and the effect of the breach was never nullified by a seasonable retraction of the repudiation. When the contract was breached, it was closed. The elevator manager's attempt to obtain a retraction of the repudiation did not reinstate the contract. Accordingly, damages should be determined on the last day the contract was in force—August 15, 1973.

The result reached in this case comports not only with what we view to be the correct interpretation of commercial law but also with ideas of fairness and equity. On August 15, 1973, Mr. Linke expressed his intention to ignore the contract he had made—to disavow it for all purposes. He should not now be allowed to assert that, for the purpose of determining damages, the contract which he repudiated in August was in full force and effect until October 1, 1973, and was not "closed" until that date.

The judgment of the trial court is affirmed.

ERICKSTAD, C. J., and PEDERSON, VOGEL and SAND, JJ., concur.