MOTT EQUITY ELEVATOR,
Plaintiff and Appellant,

v.

Rudy SVIHOVEC, Defendant
and Appellee.

Civ. No. 9126.

Supreme Court of North Dakota.

Dec. 17, 1975.

Freed, Dynes, Malloy & Reichert, Dickinson, for plaintiff and appellant; argued by George T. Dynes.

Reichert, Hardy & Howe, Dickinson, for defendant and appellee; argued by Donald L. Jorgensen.

VOGEL, Justice.

This appeal arose from an action to recover damages for failure of the defendant, Rudy Svihovec, to deliver 4,000 bushels of grain to the plaintiff, Mott Equity Elevator. The plaintiff elevator (buyer) appeals from a judgment in favor of the defendant farmer (seller). The judgment of the trial court is affirmed.

The parties entered into a contract dated October 24, 1972. Joe Munch, manager of the plaintiff corporation, acted as agent for the elevator. Under the terms of the contract, Svihovec agreed to sell to the elevator, and deliver in March, 4,000 bushels of spring wheat at $1.82 to $1.92 per bushel (the exact price to be based upon protein content).

The contract was on a printed form prepared by the buyer corporation and used by it in its business. The blanks in the form were filled in entirely in the handwriting of Joe Munch, except for the signature of the seller, Svihovec. The words "March Delivery" were handwritten by Munch on the face of the contract. The central controversy in this case is the dispute between the parties as to the meaning and effect of the contract term "March Delivery." Svihovec asserts that he agreed to a delivery in March so as to clear his bins before spring planting and to obtain funds to repay a Government loan. The elevator claims that "March Delivery" meant only that delivery was to be made in March or such later time as the elevator called for delivery.

After the contract was signed, Svihovec and his wife went to California for the winter months. Upon their return on February 28, 1973, Svihovec immediately went to the elevator and told Munch that he was ready to deliver the wheat pursuant to the contract. Munch informed Svihovec that due to a shortage of boxcars the elevator was filled and could not accept delivery of the grain.

Several times a week throughout the month of March, Svihovec asked the employees of the elevator when he could make the delivery called for under his contract. Each time, he was told that the elevator

was filled. Svihovec testified that he continued to inquire about the delivery of his grain in the months of April and May and he was always given the same reply—that there was no room for the wheat because there were no boxcars.

Svihovec testified that at the end of May he noticed two grain trucks at the elevator and, assuming that the elevator was taking in wheat, he approached Joe Munch about the delivery of his grain. According to Svihovec, Munch told him that there was little or no space in the elevator, so Svihovec began to consider other markets for his grain. Munch recalls no May conversation such as Svihovec described. Instead, he asserts that he told Svihovec in April that he could haul in his grain, and that Svihovec said he was too busy. The trial court apparently accepted the Svihovec version. We find no error.

In early June, Svihovec contacted a local trucking firm, and within a few days his grain was trucked to the Farmers Union Grain Terminal Association in St. Paul and was sold there. The plaintiff in this case, Mott Equity Elevator, is an affiliate of the G.T.A. All of the seller's grain was shipped directly to St. Paul in this manner and was sold at the Grain Terminal Association for the average price of $2.20 per bushel. After the grain was sold, Munch and his wife mentioned to Svihovec's wife and daughter that the elevator would accept delivery. Svihovec made no response. In mid-September, when the price of wheat had risen to over $4 per bushel, Munch called Svihovec by telephone and told him that the elevator was then ready to accept delivery of the grain under the contract. Svihovec replied that he no longer was obligated to deliver because the elevator had breached the contract. He went on to say that he had consulted counsel and that he would not deliver four-dollar wheat against a two-dollar contract.

This case is one of the products of the combination of severe boxcar shortages that occurred in North Dakota in the spring of 1973 and the sharp rise in the market price of grain in the summer and fall of 1973. For other cases involving the same combination of circumstances, see *Farmers Elevator Co. v. David*, 234 N.W.2d 26 (N.D. 1975); *Tower City Grain Co. v. Richman*, 232 N.W.2d 61 (N.D.1975); *Sawyer Farmers Coop. Assn. v. Linke*, 231 N.W.2d 791 (N.D. 1975); *Nelson v. Glasoe*, 231 N.W.2d 766 (N.D.1975); *Cargill, Inc. v. Kavanaugh*, 228 N.W.2d 133 (N.D.1975); *Farmers Union Grain Terminal Assn. v. Nelson*, 223 N.W.2d 494 (N.D.1974).

In its complaint the elevator asserts that Svihovec did not deliver any grain between the dates of March 1973 and September 1973 and he did not indicate a refusal to deliver until a telephone conversation between Joe Munch and Svihovec in September 1973.

Svihovec's answer generally denies the allegations in the complaint but specifically admits the existence of the contract. The defendant's answer asserts that the seller stood prepared to deliver 4,000 bushels of wheat pursuant to the contract but that the buyer refused to accept delivery during the month of March as required in the contract, and by this refusal breached the contract.

## MEANING OF THE TERM "MARCH DELIVERY"

The elevator argues that the term "March Delivery," as used in the contract, was not intended as a date of delivery but that it referred only to the price that Svihovec would be paid if he held the grain until March 1973. The elevator contends that delivery of the grain could be demanded by the elevator at any time after the month of March when there was space available in the elevator.

Svihovec, however, argues that at the time he made the sale agreement, he contracted for a March delivery. He insists that not only was time of the essence of the

grain contract, but that the entire contract was premised upon the time for delivery. The testimony of Svihovec indicates that he entered into the contract with the elevator with the intention of delivering to the elevator the contents of one particular bin of grain which was subject to a Government loan. Svihovec testified that this fact was communicated to Munch at the time of the agreement. It was important to Svihovec to have a certain market for his Government wheat because he would need funds with which to pay off the Government lien on the grain. Other testimony indicates that the March delivery was of essential importance to the seller at the time of the contract: March was the month when he would have had time to haul the wheat from the farm to the elevator before the beginning of spring work; furthermore, the grain bin was needed for storage of the anticipated 1973 crop. It may be worth noting that although Svihovec had been dealing with Mott Equity Elevator for a number of years, this contract represents the first time he had agreed to sell grain under contract for future delivery. Formerly, all his grain sales had been on a cash basis.

The elevator contends that time was not of the essence of the contract and that Svihovec's willingness to deliver the grain even as late as the month of May was a waiver of any requirement that delivery be accepted in March.

■ Where the contract does not expressly provide that time is of the essence, it is a question of fact to be determined by the trier of fact. *Nelson v. Glasoe, supra,* 231 N.W.2d at 768; *Farmers Elevator Co. v. David, supra,* syllabus ¶ 4, 234 N.W.2d at 28; Sec. 9–07–23, N.D.C.C.

■ In the case at bar, the trial court found that the parties intended time to be

of the essence at the time the contract was made. The trial judge, in his memorandum decision, stated:

"In view of the construction which our court has placed on similar contracts, it must be held that the contract as entered into by the parties required a March delivery by the Defendant and a March, 1973 acceptance of the grain by the Plaintiff corporation. It is not susceptible of any other interpretation."

In so holding, the trial court relied on the recent announcement of this court in *Farmers Union Grain Terminal Assn. v. Nelson,* 223 N.W.2d 494, 497 (N.D.1974):

"A contract is construed most strongly against the party who prepared it, and who presumably looked out for his best interests in the process."

We hold that the trial court was within its discretion in finding that under the circumstances of this case the parties agreed to a delivery in March, and not later. Whether the parties by their conduct waived the March delivery date is a separate issue.

## WAS THE PROVISION FOR MARCH DELIVERY WAIVED?

The contract in question provided merely for March delivery. The space in the printed form where a specific date could have been inserted was left blank. The manager of the elevator testified that in view of the fact that no specific date for delivery was stated in the contract, it was the elevator's duty and responsibility to notify the seller of the date on which he was to make delivery.[1]

■ Munch testified that no notice was given during the month of March 1973 by

---

1. It should be noted on this point that Munch's testimony at trial indicated that it is customary in grain contracts not to specify the exact date for delivery, to give the farmer some leeway to arrange for hauling his wheat to the elevator. Thus a broad delivery date such as "March Delivery" is not unusual; it also gives the elevator time to arrange for space for the contract grain.

the elevator to the seller to make delivery of the grain as contracted for. The buyer, having contracted with the seller for March delivery of his grain, was obligated to furnish, during the month of March, facilities reasonably adequate to receive the grain. In *Farmers Union Grain Terminal Assn. v. Nelson, supra,* 223 N.W.2d at 498–499, this court approved the following instruction of the trial court:

> " 'The Plaintiff is under a duty to exercise a reasonable amount of care and effort to provide space for Mr. Nelson's grain. In order to excuse the Plaintiff from accepting delivery on the date provided in the contract, the lack of available space must be beyond the power of the Plaintiff to prevent. You are instructed that whether the Plaintiff used a reasonable amount of care in providing available space for the grain is to be determined by you on the basis of all of the evidence in this case. If the Plaintiff failed to use said reasonable amount of care, then it cannot recover damages from the Defendant for failing to deliver the grain after March 30, 1973.' "

In this case, the buyer claims its refusal to accept delivery during March, April, and May was necessary because of insufficient boxcars or other transportation facilities with which to transport the grain from Mott to the Minneapolis market. The trial court found, however, that the evidence at trial disclosed that during the month of March 1973 the elevator received 39,675 bushels of wheat in deliveries. The trial court made the finding that the March deliveries consisted of 15,572 bushels which were received on prior contracts and 4,165 bushels which were purchased by the elevator for cash. The record is not conclusive as to the remaining 19,938 bushels, and the trial court was not satisfied with the eleva-

tor's explanations—whether it was wheat on other contracts, cash sales, or wheat stored in the elevator for future sales.

The evidence further reflects that in the month of April 53,831 bushels of wheat were delivered to the elevator, and in May 115,925 bushels were delivered. The elevator was unable to testify at trial as to the breakdown of the April and May deliveries into contract deliveries, cash deliveries, or storage for future sale. The trial court found, and it appears from the evidence, that during the month of March, the low point of deliveries of grain to the elevator, the elevator purchased more grain for cash than the 4,000 bushels involved in the Svihovec contract. This finding detracts from the elevator's argument that the shortage of boxcars made acceptance of the Svihovec contract wheat impossible.[2]

■ The trial judge found—and on the basis of the record we agree—that the plaintiff elevator breached the agreement by its refusal to accept Svihovec's grain, by failing to notify him when to make delivery, and by its failure to provide reasonable facilities for the receipt of the grain. Under Section 41–02–82, N.D.C.C. (§ 2–703 of the Uniform Commercial Code):

> "Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 41–02–75), then also with respect to the whole undelivered balance, the aggrieved seller may
>
> "1. withhold delivery of such goods;
>
> "2. stop delivery by any bailee as hereafter provided (section 41–02–84);

Svihovec was not shown to have had knowledge of any such custom.

2. Even inability to obtain boxcars might not be a complete bar to acceptance of delivery. The elevator might have been able to rent or

build additional storage, or, in case of necessity, storing the grain in the open on the ground, and thereby transferring the risk of loss from Svihovec to itself, might be held reasonable.

"3. proceed under the next section respecting goods still unidentified to the contract;

"4. resell and recover damages as hereinafter provided (section 41–02–85);

"5. recover damages for nonacceptance (section 41–02–87) or in a proper case the price (section 41–02–88);

"6. cancel."

■ Where the buyer breaches the agreement, the seller is released from his obligation under the contract and may pursue the remedies as provided in Section 41–02–82, N.D.C.C. (UCC § 2–703). The trial court found that the defendant was within his rights under the Code when he refused to make delivery under the contract and resold the wheat at a private sale. By doing so, he exercised his right under subdivision 6 to cancel the sale.

The elevator argues that even if time was of the essence of the contract, the seller's willingness to deliver the grain as late as the month of May was a waiver of the requirement that delivery be accepted in March. The elevator claims that Svihovec's conduct in holding his grain operated as a waiver under Section 41–02–16(4, 5), N.D. C.C. (UCC § 2–209).

The conduct of Svihovec in continuing his inquiries about delivery of his wheat to the elevator both before and after March 31 may have indicated an intent on his part to keep the contract alive, at least up to the latter part of May when he had his final confrontation with Munch concerning the delivery of his wheat to the elevator. If time was of the essence of the contract when the agreement was made, this particular feature may have been waived by Svihovec. *Nelson v. Glasoe, supra*, 231 N.W.2d at 768. A waiver of a "time is of the essence" provision does not leave the time-for-delivery term of the contract open, although the elevator contends that it does.

Section 41–01–14, N.D.C.C. (UCC § 1–204), provides:

"1. Whenever this title requires any action be be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

"2. What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

"3. An action is taken 'seasonably' when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time."

■ The evidence discloses that near the middle of September 1973 Munch telephoned Svihovec and demanded delivery of the wheat. By September 15, 1973, the price of wheat had jumped to more than $4 a bushel. We hold that even if time was not of the essence of the contract as a result of the waiver of this feature by Svihovec's conduct, it nevertheless was the obligation of the buyer elevator to accept delivery of the grain within a reasonable time after March 31, 1973. This the elevator failed to do. The trial court found, and we agree, that the lapse of nearly two months from the end of March, when the delivery date expired, to the last part of May, when the elevator last refused to accept the grain, was an unreasonable time within which to comply with the contract. What constitutes a reasonable time within the facts of a given case is a question of fact. *Shy v. Industrial Salvage Material Co.*, 264 Wis. 118, 58 N.W.2d 452 (1953); *Dockter v. Sheridan County*, 72 N.D. 607, 10 N.W.2d 485 (1943).

The trial judge determined that Svihovec was justified in treating the contract as breached by the elevator after he had waited almost two months for some favorable word from the elevator that his wheat would be accepted. It may be unreasonable to expect a farmer in Svihovec's position to hold his grain for a longer period under the circumstances: he had made a redemption

of his grain from a Government loan and needed money to repay the loan; there was uncontroverted testimony that some of the grain had become bug-infested and some 150 bushels had to be discarded; the risk of further loss or damage remained Svihovec's; and the storage bin was needed for the 1973 crop.

We agree with the trial judge's finding of unreasonable delay by the elevator in making its demand for delivery in September, fully six months after the contract had expired.

· The trial judge found that the elevator failed to perform within a reasonable time after a tender of performance by the seller and after the time for performance had expired. The court further concluded that the general conduct of the elevator was such as to justify the seller Svihovec in treating the contract as breached by the elevator. This court is satisfied that there is credible evidence to support such findings.

## SELLER'S RIGHT TO CANCEL

The elevator strenuously argues that Svihovec was not entitled to resell his grain under Section 41–02–85, N.D.C.C. (UCC § 2–706), without giving reasonable notice of his intent to resell. The argument also is made that Section 41–02–26(3), N.D.C.C. (UCC § 2–309), imposes a duty on Svihovec to give reasonable notice to the other party that he was terminating the contract.

We find these arguments to be without merit. Before discussing these questions, it may be helpful to reiterate the remedies available to the seller following breach by the buyer. Under Section 41–02–82, N.D.C.C. (UCC § 2–703), which is quoted above in full, the seller is entitled to, among other remedies, withhold delivery, resell and recover damages, recover damages for nonacceptance, or cancel. Svihovec pursued the remedy of cancellation, as was his right.

He thereafter resold his grain to another buyer, as was his right. The parties have confused Svihovec's right to dispose of his grain as he wished under a canceled contract with the Code remedy allowing a seller to "resell and recovery damages" under Section 41–02–82(4), N.D.C.C. (UCC § 2–703), and Section 41–02–85, N.D.C.C. (UCC § 2–706).

The seller's right to resell and recover damages is, of course, available to a seller in addition to his right to cancel; subsection 1, b of Section 41–02–98, N.D.C.C. (UCC § 2–719), creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. Official Code Comment, UCC § 2–719.

The only condition precedent to the seller's right to resell is a breach by the buyer within Section 41–02–82, N.D.C.C. (UCC § 2–703). The trial judge found that Svihovec had a right to pursue this remedy when he sold his grain directly to the Grain Terminal Association. We would agree that Svihovec did have such a right if it were necessary to apply this section to the seller's conduct in reselling his grain in this case. But the section does not apply. In a falling market Svihovec would probably have desired to resell and recover damages. To recover damages under this section he would be required to act in good faith, sell in a commercially reasonable manner, and give reasonable notice to the buyer of his intention to resell (if the sale was at private sale). Failure to act properly under this section merely deprives the seller of the measure of damages provided in subsection 1. Official Code Comment, UCC § 2–706. In any event, the seller is not accountable to the buyer for any profit made on any resale under Section 41–02–85, N.D.C.C. (UCC § 2–706), where, as here, the resale occurred in a rising market and the contract had been canceled. In this case, involving a rising market, Svihovec suffered no damages and thus did not need to resort to this Code remedy.

■ We hold that the buyer breached the agreement in not accepting delivery within a reasonable time, giving rise to Svihovec's right to cancel under Section 41–02–82(6), N.D.C.C. (UCC § 2–703). "Cancellation" is defined in Section 41–02–06(4), N.D.C.C. (UCC § 2–106), as follows:

> " 'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance."

■ The elevator's next argument is that Section 41–02–26(3), N.D.C.C. (UCC § 2–309), obligated Svihovec to notify the elevator of his intent to terminate the contract. This section does not apply to the facts of this case. Svihovec did not "terminate" the contract; he pursued the Code remedy of "cancellation" following breach by the buyer. These are two separate things under the Uniform Commercial Code. The Official Code Comment to UCC § 2–309 makes it clear that this section does not apply to cases of justifiable cancellation:

> "9. Justifiable cancellation for breach is a remedy for breach and is not the kind of termination covered by the present subsection."

In fact, under Section 41–02–06(3), N.D.C.C. (UCC § 2–106),

> " 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. . . ."

In this case, the elevator was in breach, and Section 41–02–26(3), N.D.C.C. (UCC § 2–309), does not apply. The contract was canceled, not terminated.

■ The elevator makes the argument that Svihovec is not entitled to any "windfall" he might have received when he sold his grain in June to another buyer. The elevator claims that Svihovec acted in "bad faith" by failing to notify the elevator of his intention to resell his grain. From the record, we cannot find any evidence that Svihovec acted in bad faith when he trucked his wheat directly the Grain Terminal Association and sold it for a slightly higher price than provided under the contract. There is no duty to notify of a resale where the contract is canceled. Svihovec appears to have made every effort to deliver his grain to the elevator. In fact, testimony at trial revealed that he was desperate to deliver his grain to the elevator. It must be remembered that the entire time Svihovec held the grain in storage on his farm, he suffered the risk of loss upon casualty to the grain. In fact, some of the contract grain had to be discarded due to insect damage.

Svihovec was not a seller out to take advantage of a rising market. He made arrangements to market his wheat immediately upon Munch's refusal in late May to accept delivery. When Svihovec sold the grain in June, the market price had risen to only $2.20 per bushel. The elevator, on the other hand, seeks to collect damages at the price of $4.40 per bushel, the market price in September 1973, when it contends Svihovec breached the contract.

We find no bad faith on the part of Svihovec.

Affirmed.

ERICKSTAD, C. J., and SAND, PAULSON and PEDERSON, JJ., concur.