**RED RIVER COMMODITIES, INC.,**
**Plaintiff and Appellee,**

v.

**George EIDSNESS, Defendant**
**and Appellant.**

**Civ. No. 890323.**

Supreme Court of North Dakota.

Aug. 1, 1990.

---

Yuill, Wold, Johnson & Feder, Fargo, for plaintiff and appellee; argued by Robert A. Feder.

Wheeler Wolf, Bismarck, for defendant and appellant; argued by Arnold V. Fleck.

MESCHKE, Justice.

Red River Commodities, Inc. (RRC) sued George Eidsness for breach of his contracts to grow and to deliver sunflowers. The trial court awarded RRC judgment for $33,760.50. George appealed. We affirm.

While wintering in Arizona in early 1988, North Dakota farmer George Eidsness agreed by telephone to grow and to sell 350,000 pounds of confection sunflowers to RRC at a floor price of 11.25 cents per pound. In George's absence, one of his sons signed "Confection Sunflower Production" contracts for George. Contract No. 217, signed on February 15, 1988, was for 200,000 pounds, and Contract No. 224, signed on March 4, 1988, was for 150,000 pounds. Later in the spring, George obtained sunflower seed from RRC for planting as the contracts stipulated: "The Grower agrees to purchase his seed requirements from RRC or its designated contracting representatives."

In June, George discovered that one field of sunflowers was severely weed infested. At George's request, a representative of RRC inspected the field on June 11, confirmed that George could destroy 121 acres, and prepared a handwritten letter to RRC for George's signature. The letter referred to contract No. 217 and said:

> This letter is to inform you that I have destroyed approximately 121 acres of my contracted confection sunflowers due to a severe infestation of kochia and pigeongrass.
>
> This notification is to comply with item no. 8 of the contract.

Besides weeds, drought also reduced George's crop yield.

George did not deliver any sunflowers to RRC from his 1988 crop. In mid-December 1988, RRC learned that George was selling sunflowers to a competitor at 22 cents per pound. RRC promptly sued George for anticipatory breach and also wrote George urging him to perform his contracts. George failed to deliver any sunflowers to RRC.

After trial without a jury, the trial court found that George had not signed contracts 217 and 224, that "he did receive the benefits of same" without objecting to them, and that "he endorsed and ratified same." The trial court also found that George produced sufficient sunflowers to meet his contracts with RRC "but instead sold the product to a competitor...." After adjusting contracted amounts proportionately for the destroyed 121 acres, the trial court held that George "was obligated to deliver 229,-000 pounds" and "failed to deliver any product whatsoever...." Finding that RRC purchased replacements, the trial court held that George was liable to RRC for the difference between the cost of cover at 26 cents per pound and the contract price of 11.25 cents per pound. The trial court awarded damages of $33,776.50 to RRC based on 14.75 cents for each of 229,-000 pounds undelivered.

George appealed various questions:

1. Did he contract to deliver 350,000 pounds?

2. Was he obligated to deliver 229,000 pounds?

3. Was RRC notified of low yields?

4. Was evidence wrongly excluded that RRC knew about his low yields?

5. Did he breach the contracts?

6. Did RRC "cover" reasonably?

7. Was RRC liable for his sunflower storage?

### CONTRACTS

Farmers' agreements to grow and deliver grain in the future are commonly called "forward contracts." Because crops are the chief source of income for farmers, forward crop contracts furnish economic protection to farmers. Forward contracts protect farmers from future price declines and ensure payment of production expenses. Correspondingly, forward contracts protect grain dealers from future price increases and ensure adequate supplies. *See Allenberg Cotton Co., Inc. v. Pittman*, 419 U.S. 20, 26–27, 95 S.Ct. 260, 264, 42 L.Ed.2d 195 (1974); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357–59, 102 S.Ct. 1825, 1828–30, 72 L.Ed.2d 182 (1982). Forward crop contracts are commercially important, even though unanticipated occurrences and price fluctuations sometimes upset expectations.

The Uniform Commercial Code chapter on Sales applies to transactions in goods, including growing crops. NDCC 41–02–02 (UCC 2–102); 41–02–05(2) (UCC 2–105). North Dakota Century Code 41–02–07(2) (UCC 2–107) declares that a contract for the sale of growing crops can be a present sale before severance of the crop from the land. *See Remmick v. Mills*, 165 N.W.2d 61, 67 (N.D.1968) (Growing alfalfa is "goods" under UCC); *Breden v. Johnson*, 56 N.D. 921, 219 N.W. 946 (1928) (Growing hay is "goods" within earlier Uniform Sales Act.). We are guided by the Uniform Commercial Code.

George concedes that he orally agreed to grow and deliver sunflowers to RRC. Still, George contends that the trial court misinterpreted the facts and misapplied the law to his agreements. George insists that he only agreed to grow 300 acres of sunflowers, not 350 acres, and to deliver the quantity actually produced, not 350,000 pounds. Because loss of the weedy 121 acres reduced his commitment, George urges that his net obligation was to grow 179 acres, not 229 acres. In the second part of this argument, George urges that he was only obligated to deliver actual production from those acres, not a fixed number of pounds.

The statute of frauds in the Uniform Commercial Code, NDCC 41–02–08 (UCC 2–201), makes a contract for the sale of goods for a price of $500 or more, when not signed by the party or his authorized agent, enforceable only if that party admits the contract "but the contract is not enforceable ... beyond the quantity of goods admitted." Under this statute, George argues that he was only bound to grow 300 acres. Although George admitted his oral agreements, he denied signing the written contracts and denied authorizing his son to do so for him. In his testimony, George admitted one oral agreement to grow "200 acres," and equivocated about the extent of his second oral agreement. George testified, "I thought I had said another hundred and I may have said 150, I don't know if I was wrong or not on that." George acknowledged buying seed for planting from RRC for "right around 300 acres," but later he conceded that "I was supposed to seed 350, yeah."

In addition, by dealing with RRC's representative to destroy a weedy field and by writing RRC to reduce his contract commitments, George confirmed the written contracts. *See Askew v. Joachim Memorial Home*, 234 N.W.2d 226, 237 (N.D.1975). "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." NDCC 41–02–11(1) (UCC 2–204). *See also* NDCC 41–02–14(3) (UCC 2–207). We conclude that there was sufficient evidence for the trial court to find that George ratified the written contracts. Those written contracts obligated George, as "The Grower" to "plant a minimum of

[350] acres to cover [350,000] contracted lbs."

In the second part of his contract argument, George urges that the trial court misinterpreted the contracts as requiring delivery of a fixed quantity rather than the quantity actually produced on the acreage agreed. George argues that the contracts should be interpreted as obligating him to deliver the quantity produced on the acreage agreed, not to deliver an agreed number of pounds. George testified that he harvested about 80,000 pounds from the acreage that he planted for RRC, although he harvested over 330,000 pounds from the entire 640 acres that he planted to sunflowers in 1988. According to George, the contracts only obligated him to deliver the 80,000 pounds actually produced from the 179 acres that he intended for RRC.

RRC responds that this interpretational question of acres versus pounds was not raised at the trial and was not decided by the trial court. Even so, according to RRC, the agreements unequivocally fixed a number of pounds, "not an uncertain number of pounds that may be gotten from some unspecified acres." RRC also points out that the contracts set a price per pound, not a price per acre.

The contracts were identical in wording. They described the delivery obligations in pounds but also obligated the grower to a "minimum" number of acres for "contracted" pounds:

1. This agreement is to purchase *150,000* lbs. The Grower warrants he will plant a minimum of *150* acres to cover contracted lbs.

Another clause emphasized "adequate acreage" for total pounds "contracted":

6. The Grower must notify RRC no later than June *10,* 1988 that he has planted adequate acreage to cover the total lbs. contracted, which must include a legal description of all confection acres planted.

In both clauses, acreage is used in a secondary sense "to cover the total lbs. contracted" and "to cover contracted lbs." Another clause said:

2. If Grower's production exceeds the lbs. specified (1 above), RRC will have the right of refusal on the excess production at the then prevailing market price.

In the only evidence on the subject, RRC's contracting representative testified, "It's a pounds contract. It refers to acres, but the contract is for pounds." The trial court said that the "contracts are not ambiguous nor incomplete" and determined that George "was obligated to deliver 229,000 pounds."

George did not submit any evidence that he had notified RRC of "a legal description" of acres planted for RRC as prescribed by paragraph 6 of the contracts. George did not describe how he designated particular acreage for RRC out of the 640 acres of growing sunflowers without so notifying RRC. The trial court determined, as a matter of fact, that the contracts obligated George to deliver 229,000 pounds and that he "produced sufficient sunflowers to meet [his] contracts with" RRC. George produced over 330,000 pounds of sunflowers.

A contract must be construed as a whole, and every clause, sentence, and provision should be given effect if reasonably practicable. NDCC 9–07–06; *Heupel, Inc. v. Schuch,* 453 N.W.2d 776 (N.D.1990); *National Bank of Harvey v. International Harvester Co.,* 421 N.W.2d 799, 802 (N.D. 1988). We believe that the trial court fairly determined that these contracts, construed as a whole, obligated George to deliver 229,000 pounds after adjusting proportionately for the decreased pounds from the 121 acres destroyed. Accordingly, we affirm the trial court's finding that the contracts obligated George to deliver 229,000 pounds of confection sunflowers to RRC.

## BREACH

The trial court determined that George breached the contracts "by failing to give the proper notice of low production or the inability to satisfy the contracts" as called for by the excuse clause in the contracts. Paragraph 8 of each contract said:

Fire, strikes, accidents, acts of God and public enemy, or other causes beyond the control of the parties hereto, shall excuse them from the performance of this contract. Should said events occur, either party is to notify the other within 10 days of the event by Certified Mail. Grower shall be obligated to notify RRC and the contracting representative identified below. Excuse from performance of this contract is dependent upon delivery of this notice.

George challenges the trial court's finding that RRC was not notified of drought effects as "without substantial evident[i]ary support."

Except for the weedy field, George does not claim that he personally notified RRC of any other excuse. Nonetheless, George contends that RRC had actual knowledge of his low production through a report from its representative, Richard Frith, the same representative of RRC who inspected and authorized destruction of the weedy acreage. Because RRC knew that George's production per acre was insufficient to fill his commitments, George claims that he was excused from delivering except for what he grew on his 229 acre commitment.

RRC's representative, Richard Frith, testified:

I contacted all of the growers that I worked with in October of 1988. And at that time, I determined from each one of them[,] and [George] was one ... that I contacted[,] as to how much he had in the bin when he was done harvesting. How much he felt he had in the bin and those figures were submitted to Red River.

George also complains that the trial court did not allow into evidence Frith's written report to RRC about low production by growers, which may have evidenced the extent of RRC's knowledge about George's reduced crop yields. George relies upon this testimony and the excluded report as actual notice to RRC about his low production. George argues that "RRC's actual notice super[s]edes any requirement under the contract to give notice" by certified mail. According to George, "RRC in fact did have notice and George cannot be found to have breached the contract by failing to send a document personally by certified mail."

In an appropriate case, this argument might have worth. *See Red River Commodities, Inc. v. Kelby Eidsness,* 459 N.W.2d 805 (N.D.1990). But, this argument does not help George in this case. The trial court determined that George "produced sufficient sunflowers to meet [his] contracts with [RRC] but instead sold the product to a competitor" and "failed to deliver any product whatsoever" to RRC. The contracts stipulated:

9. The Grower agrees:

\*　　\*　　\*　　\*　　\*　　\*

C. not to contract said acreage to third party. In such case this occurs grower is obligated without excuse to deliver the total lbs. stated in the contract.

George did not deliver any sunflowers to RRC and sold substantial amounts to a competitor. "The obligation of the seller is to transfer and deliver...." NDCC 41–02–18 (UCC 2–301). The trial court was entitled to view George's anticipatory breach and nondelivery as a breach of the contracts in their entirety.

When RRC sued George for anticipatory breach, RRC also wrote and asked him to perform. George testified at trial that he still had 80,000 pounds on hand for delivery if he was obligated to deliver, but he gave no acceptable reason for why he did not deliver that amount promptly after RRC's action against him. The burden was then on George to immediately retract his repudiation and to perform. NDCC 41–02–73 (UCC 2–610) (Anticipatory repudiation); 41–02–74 (UCC 2–611) (Retraction of anticipatory repudiation). *See* NDCC 41–02–72(4) (UCC 2–609) ("After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."); *Glatt v. Bank of Kirkwood Plaza,* 383 N.W.2d 473, 479 (N.D.1986); *Sawyer Farmers Cooperative Association v.*

*Linke,* 231 N.W.2d 791, 795 (N.D.1975) ("The contract was breached by the repudiation alone, and the effect of the breach was never nullified by a seasonable retraction of the repudiation."). After being sued for his anticipatory breach in selling sunflowers elsewhere, George made no effort to perform, even partially, and made no "seasonable retraction" of his anticipatory repudiation. In effect, the trial court determined that George breached the whole of the contracts.

A default in an installment contract which substantially impairs the value of the whole contract is a breach of the whole contract. NDCC 41–02–75(3) (UCC 2–612). An anticipatory repudiation, "which will substantially impair the value of the contract," authorizes the aggrieved party to "[r]esort to any remedy for breach." NDCC 41–02–73. North Dakota Century Code 41–02–90(1) (UCC 2–711) says that "[w]here the seller fails to make delivery or repudiates ... then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (section 41–02–75), the buyer may ... a. 'Cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; ...." We conclude that the trial court reasonably found that RRC was entitled to damages for George's breach of the whole of the contracts because he "failed to deliver any product whatsoever."

We do not decide whether the trial court erred in its evidentiary ruling excluding Frith's internal report to RRC about low production by growers. Since George repudiated and wholly breached his contracts by selling elsewhere and by not delivering any sunflowers, any error in excluding this item of evidence was harmless as to him. NDRCivP 61. We affirm the trial court's findings that George breached his contracts with RRC.

## DAMAGES

George argues that the trial court's finding that RRC purchased substitute sunflowers for 26 cents per pound was clearly erroneous because RRC failed to show which of many purchases covered the specific shortfall from George's default. Also, since RRC purchased some sunflowers for 24 cents per pound, George insists that the trial court should have used the lower replacement price to calculate damages.

The Uniform Commercial Code—Sales authorizes "cover" damages based on the cost of procuring substitute goods. NDCC 41–02–91 (UCC 2–712) says:

*Cover—Buyer's procurement of substitute goods.*

1. After a breach within section 41–02–90 the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

2. The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 41–02–94), but less expenses saved in consequence of the seller's breach.

3. Failure of the buyer to effect cover within this section does not bar him from any other remedy.

"It is generally accepted that if the buyer complies with the requirements of Section 2–712, U.C.C., his purchase is presumed proper and the burden of proof is on the seller to show that cover was not properly obtained." *Dangerfield v. Markel,* 278 N.W.2d 364, 369 (N.D.1979). "Cover" damages were correctly calculated here.

The trial court found that "in an attempt to mitigate damages [RRC] purchased 'cover' at $26.00 per hundred weight." Implicitly, this determined that RRC's substitute purchases at 26 cents per pound were reasonable. The trial court clarified, through its own questions to RRC's witness, that other sunflowers purchased by RRC at 24 cents per pound would have required extra processing costs to match the quality of purchases necessary to replace George's

default. No contradictory evidence was offered by George.

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." NDRCivP 52(a). We conclude that the trial court's finding about RRC's cost of cover was not clearly erroneous.

■ The contracts carried a "storage credit" of 25 cents per hundredweight per month payable to the grower for sunflowers undelivered after January 1, 1989. RRC sued in December 1988. George counterclaimed for this storage credit "[i]f there is determined to be valid contracts." After determining that George breached the contracts, the trial court concluded that this counterclaim was without merit. We agree since George failed to promptly retract his anticipatory repudiation and failed to deliver any sunflowers, thus breaching the whole of his contracts.

We affirm.

LEVINE and GIERKE, JJ., concur.

PEDERSON, Surrogate Justice, sitting in place of ERICKSTAD, C.J., disqualified.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority opinion, but I do not concur in that part of the opinion which concludes that this contract obligated Eidsness to sell a specified number of pounds of seeds rather than the amount produced from particular acreage. Because the issue was not raised below, we should not consider it here. I write separately to note I am not as convinced as is the majority that the contracts are unambiguous.

Although the construction of a written contract to determine its legal effect is a question of law for the court to decide, if the intention of the parties cannot be ascertained from the writing alone, and reference must be made to extrinsic evidence, those questions in regard to which extrinsic evidence is adduced are questions of fact to be determined by the trier-of-fact. *Tal-*

*lackson Potato Co., Inc. v. MTK Potato Co.,* 278 N.W.2d 417 (N.D.1979). Furthermore, the contract is on a printed form prepared, presumably, by Red River Commodities and any ambiguity in the contract is to be construed most strongly against Red River Commodities, who caused the uncertainty to exist, *i.e.,* the party who presumably looked out for its best interests in the process. *Cavalier Cty. Memorial Hospt. Ass'n v. Kartes,* 343 N.W.2d 781 (N.D.1984). Because the issue of ambiguity was not raised and not addressed directly below and because evidence concerning the intention of the parties as to whether or not this was an acre or a pounds contract may be significant, I do not join that part of the majority opinion which concludes this is a pounds contract.

VERNON R. PEDERSON, Surrogate Justice, concurs.