**NATIONAL FARMERS ORGANIZATION, INC., Appellant,**

v.

**Miles MADDOCK, Appellee.**

**No. 75–1604.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1976.

Decided June 14, 1976.

---

Joseph A. Vogel, Jr., Mandan, N. D., for appellant.

James H. Williams, Mattson, Williams & Hovey, Ltd., New Rockford, N. D., for appellee.

Before BRIGHT and HENLEY, Circuit Judges, and REGAN, District Judge.*

REGAN, District Judge.

In this diversity action tried to the Court,[1] National Farmers Organization, Inc.

---

* The Honorable John K. Regan, United States District Judge, Eastern District of Missouri, sitting by designation.

1. The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota.

(NFO), sought to recover damages for the alleged breach of a grain contract. Defendant counterclaimed for an amount owing for a load of sunflowers. In an unpublished opinion, the district court found for defendant. This appeal concerns only the propriety of the findings on plaintiff's claim. Our review of the record has convinced us that the findings of fact are not clearly erroneous, and accordingly we affirm the judgment.

NFO is a farm marketing organization, which, at the time material to this controversy, functioned in the role of a broker for the benefit of its farmer members in the negotiation and sale of grain produced by its members. Individual members would enter into contracts with NFO, wherein the member agreed to sell a specific quantity of grain to NFO-negotiated buyers, and NFO agreed to use its best efforts to negotiate sale of the member's grain. In an effort to obtain higher prices, NFO would "block" the contracts taken from its members and negotiate a sale of a block of grain to the buyer at a fixed price for delivery on a specific date. Upon delivery, the buyer would pay the purchase price to the NFO members' custodial account administered by the NFO at its national office. NFO would then remit the purchase price to its seller members, less certain deductions to cover expenses, commissions, and to provide for a reserve account. The reserve account, funded by deducting one-half cent per bushel from the sale of a member's grain, was established to absorb losses.

It is undisputed that in 1973 the price of wheat was rising, in that the market price at the time for contract delivery was frequently higher than the contracted price. The result was that some members defaulted on deliveries, creating problems for NFO in connection with contracts it had negotiated. And since buyers would often withhold payment until compete delivery on a delinquent contract, those farmers who did deliver would not be paid promptly.

One of NFO's delinquent contracts was with International Multifoods. That contract, for 185,000 bushels of durum wheat at $2.30 per bushel, was negotiated in September, 1972, for delivery in May, 1973. By reason of the default of members on their required deliveries, NFO was unable to fulfill the contract.

Maddock, a long-time member of NFO and in 1973 its state chairman in North Dakota, was active in a program to obtain grain from members at below the then current market price to be applied to delinquent contracts. He individually delivered three loads of durum for that purpose, the last one on June 28, 1973. After that delivery, Maddock felt that he and other farmers in his county had done more than their share in assisting NFO at a personal loss to themselves. However, delinquent contracts, including that with International Multifoods, still remained.

At a Benson County meeting of NFO, its national director urged the members to put together a block of grain, and on his assurance that the block would be sold on a new contract and not applied to an old one and that payment would be made 20 or 30 days after delivery, Maddock and other Benson County farmers agreed to form a block of 30,000 bushels of durum. Maddock was to supply 11,200 bushels as his share of the block with the understanding that the durum be sold by NFO on a new contract and not applied to a delinquent contract and that the selling price be not less than $3.10 per bushel. A written "contract" dated June 28, 1973, drafted by NFO was signed by Maddock.

This "contract" recited that the member (Maddock) and NFO agree that NFO on behalf of its members has entered or will make its best efforts to enter into a contract and has agreed to sell to NFO-negotiated buyers and that the member agrees to sell under the contract as of that date 11,200 bushels of durum (from the crop years of 1969, 1970 and 1971) to be delivered in the third quarter of 1973 (July–September). However, the word "July" was circled and the abbreviated word "Sept." was scratched, evidencing the intent that July be the delivery period. Attached to this document was a note signed by defendant

stating that the durum was to be sold (by NFO) for $3.10 or better. This "contract" was not actually delivered to NFO until July 6, 1973, when the market price was already in excess of $3.10 per bushel.

Under date of July 10, 1973, NFO sent Maddock a so-called "Official Contractual Notification" to the effect that on that date, NFO had *sold* Maddock's durum at $3.28 per bushel for delivery during the period "July 1–31." The name of the "buyer" was not disclosed in the notification. In fact, there had not been a sale of the durum. What was done by NFO without notice to Maddock and without contracting with any buyer was simply to allocate the 30,000 bushel block of durum (which included Maddock's 11,200) to International Multifoods in an effort to partially comply with its "old" contract. NFO had established the $3.28 figure for use on the "Official Contractual Notification" by means of negotiations with another grain dealer which agreed, as of July 6, 1973, to hold that price open until July 9 in the event the durum should be sold to it by NFO. By the latter date, the market price exceeded $3.28 per bushel. So far as International Multifoods was concerned, the price it was to pay remained $2.30 per bushel and it looked to NFO for performance.

When Maddock subsequently discovered that no actual new sale had been made, he refused to deliver any of the durum wheat without adequate assurance of payment. Ultimately, after various alternatives had been suggested and rejected by one or the other of the parties, Maddock agreed on July 23, 1973, to deliver the durum under an arrangement whereby he would deliver each truckload only after he had been paid on the previous load a sum equal to the 98-cent per bushel differential between the $3.28 "sale" price and the $2.30 figure which International Multifoods had contracted to pay. It was by then obvious that a July delivery for all the durum was impossible.

Pursuant to this arrangement, Maddock delivered a truckload of durum on each of the following dates: July 29, August 4, August 12 and October 14. NFO made the 98-cent per bushel differential payment on these loads on August 1, August 8, August 22 and December 6, 1973. In addition, under date of August 10, 1973, NFO made an "advance" payment of $800, the check for which Maddock did not cash until he had delivered the third load. In general, the $2.30 payments were made after the 20- to 30-day period contemplated by the parties, the last payment being made on December 6, 1973. However, as the result of the "advance" payment Maddock was overpaid $812.10 but NFO was given credit for this sum on the counterclaim.

On September 25, 1973, when the market price of durum had risen to $7.50 per bushel, International Multifoods "bought in" 74,569 bushels which were still short on its delinquent contract with NFO, thereby creating a liability of $387,758.80 owing to it by NFO. Maddock did not learn of the "buy in" nor did he know that it was threatened or contemplated until after he had made the October 14 delivery. At that time, Maddock was still ready to complete delivery of the remaining 7,926.42 bushels on his contract, at least if no penalty was assessed against him.

There is no contention that the facts we have thus far summarized are clearly erroneous. We now address ourselves to the controverted issues of fact and law. The district court found that the "contract" dated June 28, 1973, was delivered to NFO on the condition precedent that the durum be sold on a new contract and not be allocated to an existing delinquent contract.

That the evidence amply supports a finding that the "contract" was signed by Maddock upon the representation of NFO that the durum would be sold under a new contract and that payment would be made within 20 to 30 days is not disputed, it being NFO's position that such representations were mere promises, or assurances, the breach whereof would be grounds for rescission or a basis for a damage claim. Arguing from this premise, NFO contends that when Maddock finally agreed on July 23 he would deliver the durum (having by

then learned that the grain had not been sold but instead was being allocated to a delinquent contract), he thereby affirmed or ratified that voidable contract.

■ The district court's contrary finding is not clearly erroneous. Even on NFO's theory the district court could have expressly found what is implicit in the finding as made, that after Maddock ascertained that no new sale had been negotiated, he disaffirmed the June 28 "contract" (as NFO concedes was his right). There could be no ratification under the facts here present absent an intent to affirm the contract *as written*.

The evidence amply warranted the finding that as of July 23, when Maddock reluctantly agreed to sell NFO the 11,200 bushels of durum, he did so with the clear understanding of both parties that a July delivery as set forth in the June 28 "contract" was out of the question and that prompt payment of the 98-cent differential between $2.30 and $3.28 would be made after each truckload was delivered. In this situation, the trial court was justified in finding that Maddock had not ratified the June 28 "contract," but instead had agreed to a new ("modified") one which did not contain an express agreement as to the time of delivery.

■ NFO argues that under North Dakota law a contract in writing may be altered only by a writing or by an executed oral contract and not otherwise, citing Section 9–09–06, N.D.C.C. That contention assumes that the "contract" dated June 28, 1973, was a binding, valid contract at the time of the "modification." The facts, supported by the evidence, show otherwise. The "contract" of June 28, merely formed the basis for the new agreement entered into on July 23, whereby Maddock then committed himself (orally) to deliver to NFO 11,200 bushels of durum at $3.28 per bushel over an indefinite but reasonable period of time.

■ What is a reasonable time is a question of fact. *Mott Equity Elevator v. Svibonec,* 236 N.W.2d 900 (N.D.1975). It depends on the nature, purpose and circumstances of the action. Section 41–01–14, N.D.C.C. The fact that when the June 28 "contract" was signed, Maddock could have made delivery by the end of July is immaterial. What is important is the finding, which is not clearly erroneous, that as of July 23, when the new agreement was made, NFO was aware that a July delivery was "impossible" because of Maddock's purpose to clean the durum to obtain screenings for livestock feeding, the unavailability of adequate transportation, and the pending harvest. And as the trial court found, the delivery situation was aggravated by Maddock's reasonable reluctance to continue deliveries without assurance of payment by NFO.

■ The burden of proving that Maddock failed to "seasonably" deliver the durum to its damage was upon NFO. As the district court noted, Maddock maintained some 600 to 700 head of cattle and conducted a farming operation covering 4,000 acres of land of which 1,500 acres were in crops. NFO has cited us to no evidence which discloses that the "impossible" situation adverted to by Maddock on July 23 had ceased to exist. The harvest began at the end of August, and we are not advised as to the period of time it continued.

There is no evidence that Maddock was warned, either before or after he delivered the truckload of August 12, that deliveries must be speeded up. He was not informed of any agreements or discussions with International Multifoods which would necessitate more expeditious deliveries. It is obvious that NFO did not consider Maddock in default until after International Multifoods made its unilateral decision of September 25, 1973, to "buy in". NFO's brief expressly concedes: "In the immediate matter the durum could have been 'seasonably' delivered until September 25, 1973, although a provision in the official contractual notification required delivery by July 31, 1973." Maddock, who was unaware of the 74,569 bushel "buy in", delivered a truckload of durum in October which was accepted without protest. In this state of the record, the district court's finding that Maddock had

**1228**

not breached his implied agreement to deliver within a reasonable time is not clearly erroneous.

We have also concluded that the evidence supports the finding that after the International Multifoods contract had been terminated by the "buy in", Maddock was ready and able to deliver the remaining durum. He had an ample quantity of durum on hand for purposes of compliance. NFO refused to unconditionally accept further deliveries as a compliance with the July 23 contract, but instead assessed a substantial penalty. Thereafter, it refused to "waive" the penalty and made clear that it "did not give a damn" what Maddock did with the grain. This "precipitant termination" of the contract by NFO relieved Maddock of any obligation to make further deliveries.

Affirmed.