**Emil DOBLER, doing business as Queen City Lumber, Plaintiff and Appellant,**

**v.**

**Harry L. MALLOY and Lorraine Malloy, Defendants and Respondents.**

**Civ. No. 8689.**

Supreme Court of North Dakota.

Aug. 31, 1971.

Rehearing Denied Oct. 4, 1971.

**48**

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiff and appellant.

Freed, Dynes & Malloy, Dickinson, and R. J. Bloedau, Mott, for defendants and respondents.

ERICKSTAD, Judge.

This case originated in the district court, Stark County, North Dakota, on a claim for relief based upon contract, wherein the plaintiff Emil Dobler, doing business as Queen City Lumber, and hereinafter referred to as Dobler, sought damages for breach of contract from the defendants, Harry L. Malloy and his wife Lorraine Malloy, both hereinafter referred to as Malloy. Malloy counterclaimed for damages, alleging breach of contract by Dobler.

The district court sitting without a jury found for Malloy and ordered judgment in the sum of $7,054.64 plus costs. Dobler thereafter moved to amend and supplement the findings of fact, conclusions of law, and order for judgment, and, in the alternative, for a new trial. The district court denied the motion.

Dobler appeals to this court from the judgment entered in this case on June 1, 1970. He demands a trial de novo. He also appeals from the order of the district court denying his motion to amend the findings of fact and conclusions of law and his alternative motion requesting a new trial.

█ Malloy contends that Dobler's appeal from this order is invalid, since the appeal was taken prior to the service of the order. Dobler's notice of appeal is dated August 6, 1970. It was filed with the clerk of court on August 7, 1970. The affidavit of service by mail of the order denying the motion is dated August 7, 1970. The order denying the motion is dated August 5, 1970, and was filed on August 12, 1970.

The question of the timing of an appeal is governed by Section 28–27–04, N.D.C.C.

"28–27–04. Time for appeal.—An appeal from a judgment may be taken within ninety days after the entry thereof by default or after written notice of the entry thereof, in case the party

against whom it is entered has appeared in the action, and from an order within sixty days after written notice of the same shall have been given to the party appealing."

It is the intent of this section to prevent the lapse of a party's right to appeal by tolling the statutory period within which an appeal can be taken until the party has received written notice of the entry of judgment or written notice of the order adverse to him.

■ An appealing party may waive the service of a written notice. He need not do so, but he may. In this case, he waived the service of written notice by taking the appeal; accordingly, the purpose of Section 28-27-04 was fulfilled. Klaudt v. Klaudt, 156 N.W.2d 72, 76 (N.D.1968). An appeal from an order can be taken before such order is filed with the clerk of the district court. Lake Grocery Co. v. Chiostri, 31 N.D. 616, 154 N.W. 533 (1915). Dobler's appeal from this order is valid, since it was taken within the statutory period allowed for an appeal from an order.

On September 18, 1968, Dobler and Malloy entered into a written agreement for the construction of Malloy's future home near Dickinson, North Dakota. This written agreement provides in part as follows:

"It is agreed that the First Party [Dobler] will provide and furnish all materials and that said materials are to be of top quality, equipment, skills and labor necessary to do a proficient workmanlike job according to the highest standards of labor in the Dickinson area.

"It is further agreed that the said dwelling will be built on a cost-plus basis as follows:

"Labor—cost plus 25%

"Materials—cost plus 10%

"Sub-contracts—5%

"Equipment Rentals—5%

"This cost-plus feature shall not apply to materials obtained from First Party which are to be provided at a 10% discount, or what is commonly referred to as a contractor's discount.

"It is further agreed that the First Party agrees to employ David Olheiser who shall be in charge of all phases of construction and generally an overseer and foreman with the absolute right to inspect and reject all materials and labor put on or into the premises, with owner having final authority.

"It is further agreed that the owner or his agent shall have the right of inspection at any time and in the event that owner or his agents object to any material or to the quality of the labor being performed, that the owner shall have the right to terminate this agreement for good cause shown unless such condition or conditions are corrected by First Party within five (5) days' time. Likewise, if owner fails to make the payments as set forth in the following schedule without good cause, the First Party shall have the right to discontinue work upon five (5) days' notice to owner and terminate this contract.

"It is further agreed that the cost of the finished product, with paint, including but not limited to the dwelling and garage proper, sidewalk, twenty-five feet of concrete driveway to garage, scraped out road from present access road to garage in a U or Y design, cess pool and attachments, septic tank and attachments with overflow features and pump all completely hooked up and functional, including water (less well) hooked up and functioning, plumbing, heat and air-conditioning, electrical, carpet and tile flooring, less certain rooms indicated as unfinished in the basement, but also including landscaping around the house and scraping in or filling ditch on east boundary of property, shall not exceed a total cost to owner of Thirty-nine Thousand Eight Hundred Dollars ($39,800.-

00), notwithstanding the cost-plus feature of this Agreement,* and that this figure is an absolute maximum to be paid by owner under this contract, unless changes, approved in writing by the owner, shall raise the cost of the total finished product to a figure in excess of $39,800.00." [A footnote to page 2 of the contract provides that: "*It is agreed that the owner shall have the benefit of whichever method proves to be the least expensive, either cost-plus or the maximum of $39,800.00 on a contract basis."]

Prior to and during the course of the construction of Malloy's home, numerous changes were made in the architect's floor plan and in the specifications outlined in the written agreement. The dimensions of the house were changed by expanding the bedroom wing of the house, by expanding the garage, and by altering the design of the family dining area. These changes were made prior to the pouring of the footings and the foundation. Subsequently, closets, walls, doors, and stairways were relocated, and the size of the living room was expanded at the expense of the formal dining area. Several items called for in the contract to make a complete house were deleted. These items included the electrical system and carpeting.

■ In addition, many other changes were ordered to upgrade certain materials used in the house from top quality to superior quality items. These changes included superior tile, shingles, bricks, doors, and a superior garage door. Of the many changes made in the house, the only items agreed to in writing were the deletion of the electrical system and carpeting. Neither party disputes that these changes were made. When both parties orally agreed to the changes, they waived the provision of the contract that all changes must be ordered in writing. Shimek v. Vogel, 105 N.W.2d 677, 678, Syllabus 5 (N.D.1960) ; Van Nice v. Christian Reformed Church, 59 N.D. 564, 231 N.W. 604, 606, 607 (1930).

■ The crux of this lawsuit is the provision relating to the maximum price of the finished home. Had no changes been made, Malloy would have had to pay $39,800, or a lesser price had the cost-plus feature resulted in a total price of less than $39,800.

Malloy contends that the maximum price of $39,800 stated in the contract was subsequently reduced to $34,900 by the deletion from the contract of the electrical system valued at $2,000 and the carpeting valued at $2,900. These two changes were ordered in writing by Malloy. They were not acknowledged in writing by Dobler. The contract allows Malloy to order changes in writing. The contract, however, does not grant Malloy the right to lower the stated maximum of $39,800.

Malloy contends that Dobler agreed to the deletion of the carpeting and the electrical system from the contract and to the reduction of the maximum price from $39,800 to $34,900. We have found no evidence of such an agreement in the record. Dobler contends that in ordering the changes in the house from that contemplated by the contract, Malloy waived the maximum price of $39,800 specified in the contract.

We agree that the changes effected a waiver of the maximum price. In ordering the changes the total cost was raised to a figure in excess of $39,800 and this resulted in a waiver of the maximum price. Since the contract does not provide for a means of determining the cost of the house when or if changes are ordered that bring the cost of the finished house to a figure in excess of the stated maximum, the cost-plus feature of the contract must control. Any other construction of this contract would permit the owner to order changes doubling or tripling the cost and the value of a house, while limiting the owner to the stated maximum. Such a construction of the contract is unreasonable and, accordingly, we will not give it that construction.

Despite many changes in the house as contemplated by the contract, both parties performed their obligations under the contract until problems began to develop in January 1969. With the changes and extras ordered by Malloy the monthly billings for the house became so high that it became apparent that the total cost of the house would exceed the maximum stated in the contract. Several meetings were held between Malloy and Dobler, one of which was held in Malloy's office.

■ Dobler subsequently received a letter from Malloy postmarked February 15, 1969, which reads in part:

"I cannot go along with the cost-plus feature as it is obvious that it is going to be more than the contract even with the agreed upon extras, and all of the extras are not agreed upon, therefore I will try to figure out what the contract should come to after the cost-plus has been taken out."

Enclosed with this letter were nine checks made out to several laborers and subcontractors directly, in payment of the January billing sent by Dobler to Malloy. Malloy testified that he did this in order to protect himself from mechanic's liens. Dobler, however, testified that he returned these checks to Malloy because he had already paid the laborers and because Malloy did not tender to Dobler the commissions due on this labor and the subcontracts.

Subsequently, on the evening of Friday, February 21, 1969, Dobler instructed his crew not to return to work on Malloy's home on the following Monday. Also on Friday, February 21, 1969, Malloy mailed Dobler a check for $2,000, stating in the accompanying letter that, "I am paying this amount to help tide you over until we can finalize the other figures." When Malloy learned on the following Monday that Dobler had ordered his crew not to return to work, he stopped payment on the check.

On February 27, 1969, Malloy wrote Dobler to inform him that he was in violation of the contract and that he had five days to conform to the terms of the contract and continue with the completion of the project. On February 28, 1969, Dobler wrote to Malloy and advised him that he was in default of the terms of the contract for failing to make payments for January 1969.

Malloy contends that Dobler breached the contract by stopping work on the project without cause and by failing to give the five-days' written notice required by the contract. Dobler contends that Malloy breached the contract by his letter of February 15, 1969, and by his failure to pay Dobler for January's billing.

We agree with Dobler that it was Malloy was breached the contract by his letter of February 15, 1969. His statement that "I cannot go along with the cost-plus feature * * * therefore I will try to figure out what the contract should come to after the cost-plus has been taken out," constitutes an anticipatory breach of the balance of his obligation under the contract. The doctrine of anticipatory breach has previously been upheld in North Dakota. Hart-Parr Co. v. Finley, 31 N.D. 130, 153 N.W. 137, L.R.A.1915E, 851, Ann.Cas. 1917E, 706 (1915).

Malloy contends that the contract gives him this right because of the provision that, "It is agreed that the owner shall have the benefit of whichever method proves to be the least expensive, either cost-plus or the maximum of $39,800.00 on a contract basis." This provision, however, does not give him the right to take cost-plus out of the contract and to refigure the contract. On the contrary, this footnote provision is controlled by the language of the body of the contract. The maximum price alternative of $39,800 was waived by changes that raised the total cost to a figure in excess of $39,800. Accordingly, only the total cost alternative measured on a cost-plus basis remained in`

the contract. Hence, Malloy's statement that he could not go along with the cost-plus feature of the contract constitutes an anticipatory breach of the balance of his obligation under the contract.

"A contract is totally breached and an anticipatory repudiation occurs when the promisor without justification and before he has committed a breach, makes a positive statement to the promisee indicating that he will not or cannot substantially perform his contractual duties. * * * If follows that where there has been a partial breach by the promisor accompanied or followed by a repudiation of the contract by the promisor, the breach is total." Gold Mining & Water Co. v. Swinerton, 23 Cal.2d 19, 142 P.2d 22, 27 (1943). See generally Williston on Contracts, 3d Ed., Walter H. E. Jaeger, 1968, §§ 1300–1337. See also Northwest Realty Company v. Perez, 81 S.D. 500, 137 N.W.2d 345, 348 (1965).

 Since Malloy breached the contract there was no need for Dobler to give him five days' notice before telling his crew to cease work. Furthermore, Dobler was justified in treating Malloy's letter of February 15, 1969, as a repudiation of the contract, and accordingly it was proper for him to discontinue performance under the contract. Williston on Contracts, *supra*, § 1301, p. 79.

 A provision governing damages for a breach of contract is contained in the contract. It reads as follows: " * * * [A]ny breach of this contract by either party shall make such party liable for any and all damages arising out of or as a result of such breach." Since Malloy breached the contract, Dobler is entitled to damages.

Dobler's damages include all expenses incurred on Malloy's behalf in construction of the house and the commissions to which he is entitled on his expenses for labor, subcontracts, rentals, and material. Dobler is also entitled to the commissions (which

is to say, the profit) that he would have made if Malloy's breach had not prevented him from completing the house. Williston on Contracts, *supra,* § 1363, p. 343; 22 Am.Jur.2d Damages § 174, p. 246 (1965); 13 Am.Jur.2d Building and Construction Contracts § 78, p. 78 (1964); Restatement of the Law of Contracts, § 331, p. 515, American Law Institute, 1st Ed. (1932).

Upon a review of all the evidence in this case, we find that the evidence on the question of the amount of damages due Dobler is not sufficiently clear to permit us to determine this amount.

The judgment of the district court is therefore reversed and the case is remanded to the district court for a new trial to determine the amount of damages due Dobler in accordance with the law set forth in this opinion. From this amount the district court will allow Malloy a set-off to the extent that he can prove damages in the inferior construction of his home as the result of Dobler's phase of the work on his home.

STRUTZ, C. J., and TEIGEN, KNUD-SON, and PAULSON, JJ., concur.