James G. GLATT, Ruben C. Scherle
and East Plaza Development,
Plaintiffs and Appellees,

v.

BANK OF KIRKWOOD PLAZA,
Defendant and Appellant.

Civ. No. 10939.

Supreme Court of North Dakota.

March 3, 1986.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for plaintiff and appellee James G. Glatt; argued by David L. Peterson.

Chapman & Chapman, Bismarck, for plaintiff and appellee Ruben C. Scherle; argued by Daniel J. Chapman.

Lamb, Schaefer, McNair & Larson, Fargo, and Bair, Brown & Kautzmann, Mandan, for defendant and appellant Bank of Kirkwood Plaza; argued by Malcolm Brown. Appearance by Robert J. Schaefer.

Appearance by Keith C. Magnusson, Bismarck, for North Dakota Bankers Ass'n, amicus curiae.

MESCHKE, Justice.

The Bank of Kirkwood Plaza (the Bank) appeals from a district court judgment entered upon a jury verdict and from an order denying its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial entered in an action brought by Glatt, Scherle, and East Plaza Development (hereinafter collectively referred to as the developers) for repudiation of a contingent loan commitment. We affirm as to liability, reverse as to damages, and remand for a new trial on the amount of damages only.

By letter dated July 16, 1982, the Bank, through Senior Vice President H. Charles Boyd-Snee, gave the developers a commitment:

"... to lend $1,700,000 for the purpose of purchasing condominium units and construction funds to complete racquetball, health club, restaurant and bar facilities in the Metro Business Park...."

The commitment was subject to 23 conditions and was stated to be binding on the Bank for six months.

On August 10, 1982, Ray Lamb,[1] Boyd-Snee, Glatt, and Scherle toured the project site. At a meeting the next day, Mr. Lamb, according to Scherle, stated: "I am

---

1. Mr. Lamb was the chairman of Dakota Bank of Fargo and president and majority stockholder of Dakota Bankshares, Inc., a holding company which owned a majority of the stock of the Bank of Kirkwood Plaza.

not going to make this loan." Scherle testified that the reasons Lamb gave were the unwillingness of the Bank of North Dakota to participate in the loan and "that the racquetballs and the recreation facilities in the areas are not successful, ..." Lamb testified that at the August 11 meeting he told Glatt and Scherle:

"... that the Bank of North Dakota was absolutely not interested in participating in the loan ... that I felt that the loan was not a workable loan ... that we were not favorably disposed to do the loan participation at the Dakota Bank in Fargo." [2]

On September 3, 1982, Max Rosenberg, counsel for the developers, had a telephone conversation with Mr. Lamb, from which he concluded that there "wasn't any question" that the Bank was not going to go through with the loan commitment. Rosenberg later received a letter dated September 8, 1982, stating:

"As I informed you on the telephone on Friday, September 3, 1982, your two clients may sue the Bank of Kirkwood Plaza if they so desire....

\* \* \* \* \* \*

"In any event, our answer is final in that your clients have not met the criteria set forth in the letter from the Bank of Kirkwood Plaza nor does it appear that they are able to...."

The letter was on stationery bearing the letterhead of Dakota Bankshares, Inc., and was signed by Mr. Lamb over the following legend:

"Raymond A. Lamb
President and
General Counsel"

The developers sued the Bank for specific performance of the commitment or damages by summons and complaint dated September 20, 1982. Trial to a jury resulted in a verdict and damage judgment for the developers in the amount of $3,578,480.50. The Bank moved for judgment notwith-standing the verdict or new trial on the grounds, among others, of surprise in the introduction and use of an appraisal report, excessive damages, insufficiency of the evidence to support the verdict, errors in instructions, and errors in the conduct of the trial. The motion was denied. On appeal, the Bank presents a series of issues involving both liability and damages.

## I. *Liability*

### A. Instructions on Burden of Proof

■ The Bank and amicus curiae urge that the trial court erred in placing on the Bank the burden of proving that the developers could not have met the conditions precedent contained in the commitment letter, rather than placing on the developers the burden of proving that they could have met the conditions. The parties have referred us to numerous citations of authority in support of their positions. However, we deem it unnecessary to decide upon which party this burden of proof ought to have been placed.

At a January 7, 1985 hearing on pretrial motions, the trial court stated:

"... But in terms of trying to establish whether or not they [the developers] could have met those conditions, it would not be a matter then of them proving they could have, but a matter of you [the Bank] proving that they could not."

When the trial court asked for his reaction, counsel for the Bank responded:

"MR. McNAIR: Well, first of all, your Honor, I don't disagree with the Court's analysis, ...

\* \* \* \* \* \*

"MR. McNAIR: I guess all I am arguing, there are two sides of the question: number one, the bank has the opportunity to show that the conditions precedent were not met prior to its denial; number two, obviously, the opportunity to show

**2.** The Bank's ability to induce other banks to participate in the loan was not one of the 23 conditions listed in the commitment letter.

they couldn't have been met before the commitment."

The trial court then ruled as follows:

"Well, I think, gentlemen, insofar as that motion is concerned, I come down sort of in between both of you here. I am going to rule in accordance with what I am suggesting, that, while Mr. Peterson does not have to prove that his client could have met those conditions, I will, in effect, be instructing the jury that if the greater weight of the evidence shows that those conditions could not have been met, that, in effect, there is no damage."

The foregoing excerpts indicate that the Bank not only failed to object to the trial court's placement of the burden of proof about the developers' ability to perform the conditions precedent, but agreed with the trial court's analysis. The Bank received everything that it asked for—an "opportunity to show that the conditions precedent were not met" and an "opportunity to show they couldn't have been met." The Bank, which did not ask that the burden of proof be placed on the developers, will not now be heard to complain about something that it did not object to and agreed with. Error, if any, that is invited, acquiesced in, or not objected to, may not be raised on appeal as a ground upon which to reverse a judgment. *Chaffee Bros. Co. v. Powers Elevator Co.*, 41 N.D. 94, 170 N.W. 315 (1918); *Frieh v. City of Edgeley*, 317 N.W.2d 818

(N.D.1982); Section 31–11–05(6) and (7), N.D.C.C.

The trial court instructed the jury:

"It is a defense, however, if the greater weight of the evidence establishes that the plaintiffs could in no event have met the conditions upon which the loan was contingent, because it would follow that the withdrawal of the commitment would have caused no damage."

The Bank had requested a nearly identical instruction, but without the first five words, which the Bank contends compounded the error of placing the burden of proof on the Bank.

At the pretrial hearing on January 7, 1985, the trial court, in accordance with Rule 51, N.D.R.Civ.P., gave the parties proposed instructions and directed them to respond by noon on January 11, 1985. The developers filed a brief objecting to the instruction. The Bank filed a brief outlining its position on elements of damage, but did not address or object to the instruction. On the first day of trial, the court again provided the parties with an opportunity to object to the proposed instructions. The developers again objected to the instruction and the Bank again did not object to it. The court then read to the jury eight pages of instructions, including the one at issue, and the trial began.[3] Thus, the Bank, though given the opportunity to do so, did not object to the instruction given and we will not consider it.[4]

---

3. We need not consider the appropriateness of instructing the jury on the merits at the outset of the trial. While it is not a customary practice in our state, a recent study suggests that it may be a useful approach in some cases:

"The use of extensive instructions before the presentation of evidence was the only technique that produced a significant improvement in the jurors' overall satisfaction with the way the trial was conducted. Judges and attorneys agreed that the technique was useful and that its use did not benefit one side more than the other." *Techniques for improving juror effectiveness*, National Center for State Courts Report (Volume 13, Number 1, January 1986) (in which the author was reporting preliminary results from experiments sponsored by the Judicial Council of Wisconsin).

4. We have determined that we need not decide upon which party the burden of proof regarding

the developers' ability to perform the conditions precedent ought to have been placed. We note, however, that California courts construing Cal. Civ.Code §§ 1440 and 1495, which share with §§ 9–01–16 and 9–12–16, N.D.C.C., a common derivation from the Field Code, have held that there must be proof of the plaintiff's ability to perform conditions precedent and place the burden of proof upon the plaintiff. See *McDorman v. Moody*, 50 Cal.App.2d 136, 122 P.2d 639 (1942), and *Dickey v. Kuhn*, 106 Cal.App. 300, 289 P. 242 (1930).

California Civ.Code §§ 1440 and 1495 share with §§ 9–01–16 and 9–12–16, N.D.C.C., a common derivation from the Field Code, which, although not adopted by New York for which it was proposed in 1865, was adopted by Dakota Territory in 1865 and by California in 1872. See *Becker v. Becker*, 262 N.W.2d 478, 483 (N.D. 1978); R. Vogel, *Looking Back on a Century of*

## B. Failure to Give Requested Instructions

The Bank contends that the trial court erred in failing to give its requested instructions on the formation of contracts, fulfillment of conditions precedent to the establishment of a contract, anticipatory repudiation, and retraction of anticipatory repudiation.

■ The Bank contends that the court erred in failing to give its Proposed Instruction No. 1, which generally defined contracts, parties, consent, the object of a contract, and consideration. The trial court refused to give the instruction on the ground that it was unnecessary. We agree. There was no dispute about what a contract is, whether the parties were capable of contracting, whether there was consent, whether the object of the contract between the parties was lawful, or whether there was consideration.

■ The trial court refused to give the Bank's Proposed Instruction No. 2 and No. 3, which defined conditions precedent and stated that one must perform them before requiring another party to perform any act, because they were "contrary to the rule in the last paragraph, since I placed the burden on the bank to establish that they could not meet the conditions." The requested instructions were inapplicable to this suit for anticipatory repudiation of a loan commitment letter, as distinguished from a suit for breach of the loan agreement at the end of the commitment period.

The trial court refused to give the Bank's Proposed Instruction No. 9 and No. 10, dealing with offer and acceptance and acceptance of a unilateral offer by performance of the requested act, because:

"No. 9 is again—9 and 10, I think are something that really don't apply to the context that we are in here, because there has never been a question as far as I am concerned in the evidence that the defendant—that the plaintiffs accepted the offer. It is a question of whether or not they could meet the conditions."

We agree with the trial court's analysis.

The Bank contends that the trial court erred in failing to give its Proposed Instruction No. 4:

### "ELEMENTS OF PROOF

"Before the Plaintiffs can recover, the greater weight of the evidence must establish:

1. That the bank made a contingent loan commitment to the Plaintiffs; and

2. That the bank anticipatorily breached its commitment before the expiration of the time which the Plaintiffs were given to comply with the conditions; and

3. The amount of damages, if any, sustained by the Plaintiff as a result of the withdrawal of the commitment.

"Anticipatory repudiation occurs when the promisor without justification and before he has committed a breach, makes a positive statement to the promisee indicating that he will not or cannot substantially perform his contractual duties.

"If the promisor is merely insisting upon compliance with the terms of the contract, then his insistence is not an anticipatory breach or repudiation of the contract.

"If the greater weight of the evidence establishes that the Plaintiffs could in no way have met the conditions upon which the loan was contingent, then the Plaintiffs may not recover because it would follow that the withdrawal of the commitment would have caused no damage."

*Complete Codification of the Law*, 53 N.D.L.Rev. 224 (1976); W. Fisch, *The Dakota Civil Code: More Notes For an Uncelebrated Centennial*, 45 N.D.L.Rev. 9 (1968); W. Fisch, *Civil Code: Notes for an Uncelebrated Centennial*, 43 N.D.L.Rev. 485 (1967) [which distinguishes the Civil Code proposed for New York by David Dudley Field from the "more famous Code of Civil Procedure, which is most frequently referred to as 'the Field Code'"]; *Preface*, Vol. 1, N.D.R.Code 1943; *Preface*, N.D.R.Code 1895; and *Preface*, Revised Codes of the Territory of Dakota (1877). Because of this common derivation, California court decisions construing Field Code sections, while not binding, are entitled to respectful consideration, and may be "persuasive and should not be ignored." (*Becker v. Becker, supra*, at 483).

Instead of the Bank's Proposed Instruction No. 4, the trial court gave the following instruction:

## "ELEMENTS OF PROOF

"Before the plaintiffs can recover, the greater weight of the evidence must establish:

(1) that the bank made a contingent loan commitment to the plaintiffs;

(2) that the bank withdrew its commitment before the expiration of the time which the plaintiffs were given to comply with the conditions; and

(3) the amount of damages, if any, sustained by the plaintiffs as a result of the withdrawal of the commitment.

"It is a defense, however, if the greater weight of the evidence establishes that the plaintiffs could in no event have met the conditions upon which the loan was contingent, because it would follow that the withdrawal of the commitment would have caused no damage."

■ By defining anticipatory repudiation, the requested instruction was more comprehensive than the instruction given. We do not, however, agree with the Bank's argument that instructing in terms of withdrawal of the commitment instead of in terms of anticipatory repudiation was erroneous. We note that the Bank injected the concept of "withdrawal of the commitment" in its proposed instruction. In our view, withdrawal of the commitment before expiration of the time given for compliance with the conditions was an anticipatory repudiation of the commitment. The instruction given, while sparse, adequately apprised the jury that in order to impose liability on the Bank, it must find "[t]hat the bank anticipatorily breached its commitment." Because the instruction given correctly advised the jury, there was no error in refusing to give the requested instruction even if it was a correct statement of the law. *State v. Dilger*, 338 N.W.2d 87 (N.D.1983).

■ The Bank asserts that the trial court erred in refusing to give its Proposed Instruction No. 3A:

## "ENFORCEMENT OF OBLIGATIONS—PREREQUISITES

"Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself and must be able, and must offer, to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party, but if one party to the obligation gives notice to another before the latter is in default that he will not perform the same upon his part and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

The requested instruction is a recitation of the provisions of § 9–01–16, N.D.C.C., and is a correct statement of the law. We do not, however, find any error in refusing to give the instruction.

The theory behind the Bank's request for Proposed Instruction No. 3A is succinctly stated in its reply brief:

"The Bank had also requested a jury instruction regarding retraction of an anticipatory repudiation. There is substantial evidence submitted at trial that showed that if there was any repudiation, that repudiation was effectively retracted before East Plaza was required to comply with the conditions. The Bank clearly stated that it would fund the loan through the deposition testimony of Charles Boyd-Snee, and the Summary Judgment Motion of Attorney Zuger."

The theory is flawed. The deposition testimony of Boyd-Snee and the summary judgment motion, if they were retractions, came after the developers filed suit for breach of contract by anticipatory repudiation of the commitment. A retraction of an anticipatory repudiation after the injured party sues for enforcement or damages comes too late.

■ The doctrine of breach of contract by anticipatory repudiation has been adopted in North Dakota. *Sawyer Farmers Coop. Ass'n v. Linke*, 231 N.W.2d 791 (N.D.1975); *Dobler v. Malloy*, 190 N.W.2d 46 (N.D.1971); *Hart-Parr Co. v. Finley*, 31 N.D. 130, 153 N.W. 137 (1915). A party injured by another party's anticipatory repudiation may elect to immediately sue for damages. *Hart-Parr Co. v. Finley, supra.* See also *Daum v. Superior Court*, 228 Cal.App.2d 283, 39 Cal.Rptr. 443 (1964), *McDorman v. Moody*, 50 Cal.App.2d 136, 122 P.2d 639 (1942), and *Dickey v. Kuhn*, 106 Cal.App. 300, 289 P. 242 (1930), wherein the California courts have held that Cal. Civ.Code § 1440, which with the relevant portion of § 9–01–16, N.D.C.C., shares a common derivation from the Field Code, recognizes anticipatory repudiation and that an anticipatory repudiation creates an immediate right of action before the time specified for performance and before contract conditions have been performed. Because a party injured by another party's anticipatory repudiation may elect to immediately sue for damages, a retraction of an anticipatory repudiation must be made before suit is brought to be effective. *See* Restatement (Second) of Contracts § 256(1) (1981), which outlines the relevant rule:

"Nullification of Repudiation or Basis for Repudiation. (1) The effect of a statement as constituting a repudiation under § 250 or the basis for a repudiation under § 251 is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final."

Comment *c* to § 256 notes that commencement of an action for damages by the injured party is sufficient indication that he considers the repudiation final.

■ That the developers sought specific performance, as an alternative to damages, confirms our conclusion that commencement of this action finalized any repudiation. Retraction at that stage is necessarily a matter constituting an avoidance [5] which must be set forth affirmatively in the answer. Rule 8(c), N.D.R.Civ.P. The Bank did not plead such an affirmative defense, but continued to resist performance with an array of defenses. Since a post-action retraction is an avoidance which, procedurally, must be set forth by pleading, which was not done, there was no factual issue on retraction to submit to the jury. At trial, the developers sought only damages for the repudiation. Procedurally, post-action retraction was no longer an issue.

Therefore, there was no error in refusing the requested instruction on retraction of a repudiation.

### C. Sufficiency of the Evidence

■ The Bank urges that the verdict is not supported by the evidence because the evidence shows that the conditions precedent could not have been met, and, therefore, the trial court erred in denying its motion for judgment notwithstanding the verdict or new trial.

In ruling on a motion for j.n.o.v., the trial court must view the evidence in the light most favorable to the party against whom the motion is made, without weighing the evidence or judging the credibility of the witnesses, to determine whether or not the evidence leads to but one conclusion as to the verdict, about which there can be no reasonable difference of opinion. *Zajac v. Old Republic Ins. Co.*, 372 N.W.2d 897 (N.D.1985). In ruling on a motion for a new trial, the trial court may weigh the evidence and judge the credibility of the witnesses in order to decide whether or not the verdict is against the weight of the evidence. *Benefiet v. Hoiby*, 370 N.W.2d 513 (N.D.1985). A trial court's decision on

5. We use "avoidance" in the generic sense, as it is used in Rule 8(c), N.D.R.Civ.P., rather than in the technical sense of the doctrine of avoidable consequences, which is the general rule relating to the duty of a contracting party to minimize damages. *Schneidt v. Absey Motors, Inc.*, 248 N.W.2d 792, 796 (N.D.1976); *Stetson v. Investors Oil, Inc.*, 140 N.W.2d 349, 358 (N.D.1966).

a motion for a new trial will not be reversed on appeal unless the trial court has manifestly abused its discretion. *Zajac, supra.*

The Bank contends that the trial court erred in denying its motion because the evidence shows that the conditions precedent could not have been met. We disagree. When viewed in the light most favorable to the developers, there is evidence from which the jury could reasonably find that the conditions could have been met. The trial court, therefore, did not err in denying the motion for j.n.o.v. Nor are we able to conclude that the trial court manifestly abused its discretion in denying a new trial on the issue of liability. The jury's finding with regard to the conditions is not against the weight of the evidence.

### D. Jury Argument

■ The Bank asserts that the trial court erred in refusing to grant the Bank's request for a cautionary instruction or a mistrial because of improper argument to the jury by counsel for the developers. The arguments complained of are a "Golden Rule" argument and an argument about the Bank's failure to call witnesses.

The Bank first asserts that the following portions of the developers' argument constitute reversible error:

"Just put yourself in the position of the parties, and I think that if you do that—if you put yourself in Jim and Ruben's shoes—their project is off and running in good shape, they want to enter into the second phase, they get a commitment, and the commitment is in writing.

\*    \*    \*    \*    \*    \*

"Place yourself in Ruben and Jim's shoes when told by Lamb, it's over, on August 11th....

\*    \*    \*    \*    \*    \*

"And I will say to the members of the jury, if you were in this position and you knew that your business—one of the major businesses that you are involved in, East Plaza, is about to be lost to the tune of that kind of money, I submit to you that you would also travel the length and breadth of this country attempting to right the wrong that had been visited upon you by a local bank."

The Bank next asserts that the following portions of the developers' argument constitute reversible error:

"Also, I am very interested in references by Mr. Schaefer to a Mr. Raaum. Now, one wonders who Mr. Raaum is. Well, he was president of the bank. But where was he insofar as his testimony here today is concerned, or this past week?

"Now, the defendant, of course, would have access to him. He is a former officer of that bank. If some of the things that Mr. Schaefer is saying could have been verified by Mr. Raaum, he could have and should have been here to testify with regard to those matters. But he was not here, and that is an interesting omission.

\*    \*    \*    \*    \*    \*

"The fact of the matter is, that condition could easily have been met, and not only have they failed by the greater weight of the evidence to show that it couldn't, they have failed to bring any evidence in here other than self serving statements of Lamb and Boyd-Snee regarding what they felt about it. They really didn't know what it meant. Again, Mr. Johanneson and Mr. Olson didn't come in and support the defendant's contention that they were not going to comply with that."

After the jury had received its instructions and had retired for its deliberations, the Bank, without having previously objected or requested cautionary instructions, moved for a mistrial upon the ground of improper argument. The motion was denied and the Bank then asked for a cautionary instruction with respect to the "Golden Rule" argument. That request was also denied. The Bank asserts that, absent a cautionary instruction or withdrawal by counsel, the "Golden Rule" arguments constitute reversible error. We disagree.

While "Golden Rule" arguments should generally be avoided (*see* Annot., *Prejudicial effect of counsel's argument, in civil cases, urging jurors to place themselves in the position of litigant or to allow such recovery as they would wish if in the same position*, 70 A.L.R.2d 935), we find no reversible error. Error may not be predicated on an argument of counsel unless there was a timely objection and a ruling by the trial court. *Klein v. Harper*, 186 N.W.2d 426 (N.D.1971). To take advantage of irregularities during trial, one "must do so at the time they occur, to the end that the court may take appropriate action if possible to remedy any prejudice that may have resulted." *Braun v. Riskedahl*, 150 N.W.2d 577, 583 (N.D.1967). See also *Larson v. Meyer*, 135 N.W.2d 145 (N.D.1965). The trial court's refusal to grant a motion for mistrial or to give a cautionary instruction upon an untimely objection through a motion for mistrial and request for a cautionary instruction made only after a jury has retired for deliberations is not reversible error.

The Bank asserts that the developers' argument about the Bank's failure to call Raaum, Johanneson, and Olson as witnesses constitutes reversible error because the potential witnesses were equally available to all parties. We disagree. No instruction, such as the pattern instruction suggested by NDJI 1006, which advises that in certain instances jurors may infer from a party's failure to produce a witness that the witness' testimony would be unfavorable, was requested or given. Giving such an instruction probably would have been error because the potential witnesses were equally available to all parties.

Counsel for the Bank, in argument to the jury, stated that Raaum and the local directors of the Bank had "a say on how that bank is run," and that:

"The simple fact is that Mr. Johanneson and Mr. Olson wouldn't or didn't buy the units, nor did Mr. Johanneson at any time agree to pledge his equity in that contract for deed." [6]

In our view, the developers' rebuttal jury argument about the absence of Raaum, Johanneson, and Olson, was fair comment in response to the Bank's assertions about Raaum's "say" in running the Bank, that Johanneson and Olson would not buy the units, and that Johanneson never agreed to pledge his equity. The argument complained of was not so much a request that jurors draw an adverse inference from the absence of Raaum, Johanneson and Olson as it was an attempt to draw to the jurors' attention the fact that counsel for the Bank in his argument had made assertions about them that were not supported by their testimony. Further, as we discussed earlier, an objection raised only after the jury has retired is not a timely objection and the trial court's decision to deny the Bank's motion for a mistrial was not reversible error.

## II. *The Amount of the Verdict*

In their original complaint dated September 20, 1982, the developers sought damages "in the reasonable amount of $800,000.00, or such other amount as may be proven at trial, for business losses, interest payments, loss of profits, and other damages proven at trial." By motion served November 12, 1984, the developers sought to amend their complaint to substantially broaden the scope of damages:

"... damages in the reasonable amount of $5,000,000.00, said damages consisting of, but not limited to:

(a) Loss of equity position in KRGS Inc.,

(b) Loss of equity on East Plaza Development property;

(c) Loss of money expended on East Plaza Development project after receipt of commitment, said expenditure being necessary to be made in order to show good faith attempt to complete the

---

6. Condition 23 of the commitment letter stated: "Kent Johanneson and Richard Olson to buy units # 1214 and # 1220 for the purchase price

of $140,000, or pledge present contract for deed concerning their sale of the Colonial Motel to this debt."

project when requesting funds from additional lenders;

(d) Expense for interest paid to United Bank and Bismarck State Bank on interim financing;

(e) Expense money for plaintiffs in an attempt to secure additional financing;

(f) Attorneys fees and accountant fees and appraisal fees expended in an attempt to secure other financing;

(g) Money judgment gotten against plaintiffs because of defendant's refusal to provide funding pursuant to the commitment;

(h) Lost profits incurred by the plaintiffs because of the breach."

On December 20, 1984, the Bank requested a continuance in order to prepare for and engage in discovery regarding the increased damages sought. On January 11, 1985, the developers' motion to amend to broaden the scope of damages was granted and the Bank's motion for continuance was denied. The trial court precluded the Bank from further depositions of the developers about damages, although it did offer the Bank an opportunity to obtain some additional discovery on damages through interrogatories to be answered by developers before trial. The trial commenced on January 28, 1985. The Bank contends that the denial of its motion for a continuance was an abuse of discretion under these circumstances.

The Bank also contends that the trial court erred in permitting use at trial of an "updated and previously undisclosed" appraisal (containing 91 pages) which the Bank claims surprised counsel and materially affected the amount of the verdict. The Bank combines these direct assaults on the amount of the verdict with an argument about the court's instructions with respect to the "completed project."

We find sufficient merit in these parallel attacks on the amount of the verdict to direct a new trial on the issue of damages only. Circumstances reflect that the Bank's opportunity to adequately respond to the expanded claim of damages was handicapped.

The new appraisal, dated January 29, 1985, the second day of trial, valued the entire Metro Business Park property at $6,325,000 as of March 5, 1984. It had not been made available to the Bank before the appraiser testified on the third day of the trial and was introduced over objections by the Bank. An earlier appraisal made by the same appraiser, on July 23, 1982, for purposes of the contingent loan committment, had covered only Buildings One and Four of the Metro Business Park property which were the buildings in which the improvements and condominium units were to be completed with some of the proceeds from the loan expected from the Bank. This earlier appraisal had valued Buildings One and Four, without the underlying land, on a "to be completed" basis at $1,680,000. The January 29, 1985 appraisal valued Buildings One and Four and all the land in Metro Business Park (except 3,500 square feet owned by Scherle) on an "as if completed" basis at $5,595,000 (after deducting $730,000 allocated to the land). Thus, the differences between the appraisals were substantial.

The trial appraisal did not address the market value of the property actually foreclosed on March 5, 1984, nor did it reflect costs of completing the hypothetical "project" it valued. Rather, it was premised on several assumptions about the "scope of the project" of Metro Business Park: "as if" the Bank's loan for a portion had been made, and "as if" the improvements to be financed by the loan had been completed. Developers' theory of damages further assumed that this entire "as if completed" project had been lost by foreclosure. Thus, damages postulated by the last-minute appraisal went beyond what the developers actually lost, but sought to encompass an ill-defined loss of expectations, as well.

Under these circumstances, we believe that the Bank was entitled to more time to prepare to meet this "new" evidence than an extra hour over the luncheon recess. The close correspondence between the valu-

ation in the appraisal (after deducting only mortgage amounts) and the verdict is indicative of high reliance by the jury on the appraisal. Since it appears that this new appraisal, with its assumptions about the "scope of the project" and significant increases in values, had a very material effect upon the amount of the verdict, we conclude that a new trial on the issue of damages is warranted. *Stude v. Madzo*, 217 N.W.2d 5 (N.D.1974).

There is another troubling aspect to the appraisal. While based on an assumption that one entity owned the entire project, the appraisal indicated that some of the units in the project had been sold, at least by March 5, 1984. The appraiser testified that "eleven of the units were either sold or under occupancy." Developers' evidence did not establish, nor explain, how many units had been "sold," when they were sold, who sold them, or who (the developers or the lender who acquired Metro Business Park through foreclosure proceedings) received the money for the sold units. That these matters were not developed appears to have been due in part to the fact that the Bank had no opportunity to study the appraisal before the appraiser testified. We believe the developers' failure to account for sold units, together with the trial court's instruction that the measure of damages was the "loss of equity the property would have had if the project had been completed as contemplated by the parties," may have caused the jury to incorrectly measure damages.

This leads directly into another troubling aspect as to the amount of the verdict: the scope of the project "completed as contemplated by the parties." The developers contend that it is the Metro Business Park as it would have been when improved by proceeds from the loan. The Bank contends that the scope of the project should have been limited by the trial court to only the property which would have been improved by loan proceeds. We do not choose between these disparate views on this appeal because we are not satisfied that the subject was adequately explored below, given the changes in the assumptions and the evidence of the developers' damages just before and at the trial. Because we are directing a new trial on the issue of damages only, we address some of the relevant legal considerations which should guide the trial court in his rulings on evidence and submission to the jury of the issue of damages caused by the Bank's repudiation.

Restatement (Second) of Contracts § 351 (1981) succinctly summarizes the applicable legal principles:

"(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

\*  \*  \*  \*  \*  \*

"(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation."

Comment *e* to § 351 notes that while in most cases a lender's liability for breach of a contract to lend money "will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender," a lender who has "reason to foresee that the borrower will be unable to borrow elsewhere ... may be liable for much heavier damages."

Prior decisions of this Court have recognized these principles of legal limitations on damages for breach of contract. *Turner v. Affeldt*, 34 N.D. 239, 158 N.W. 263 (1916), affirmed a jury verdict as to liability of a buyer for repudiating a contract to purchase installation of a heat and water plant in his residence, but reversed for a new trial on damages because evidence was improperly admitted as to the seller's losses on installing the plant in another residence at a price below what the defendant had agreed to pay.

"Manifestly the damages sought to be recovered by plaintiff for the breach by defendant cannot be properly stated to have been in the contemplation of the

parties at the time the contract was entered into." 158 N.W. at 263.

And, *Lindsay v. Nichols & Shepard Threshing Mach. Co.*, 59 N.D. 313, 229 N.W. 808 (1930), reversed a jury award of damages to a farmer for the failure and refusal of the seller to deliver a second-hand separator. The buyer had introduced evidence that he lost grain and missed opportunities to thresh for neighbors when continuous and damaging rains started about a week after the agreed delivery date. While it was recognized that "damage to the crop from the contemplated hazard or in the loss of profits due to the consequent inability to perform such contracts would be recoverable," where "the contract had been made and the date fixed with reference to special circumstances," 229 N.W. at 809, a part of the holding was that such damages were not recoverable "where the contract is not entered into under the special or exceptional circumstances...." 229 N.W. at 809.

On the other hand, *Murphy v. Hanna*, 37 N.D. 156, 164 N.W. 32 (1917), held that lenders, who repudiated an agreement to loan money to a bank in financial straits, could be held liable for damages for losses arising from the bank being "forced to close its doors and discontinue its banking business."

> "There is no reason why substantial damages may not be allowed for the breach of a contract to loan money, within the rule of Hadley v. Baxendale, supra, where special circumstances were known by both parties to exist at the time the contract was made, from which it must have been apparent that special

damages would be suffered in case of the failure to fulfill the obligation." 164 N.W. at 38.

A number of decisions from other jurisdictions have held that a lender is liable for consequential damages resulting from the lender's breach of an agreement to lend money. *See, e.g., Harsha v. State Savings Bank*, 346 N.W.2d 791 (Iowa 1984); *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 681 P.2d 390 (App.1983); *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A.2d 12, *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); *F.B. Collins Inv. Co. v. Sallas*, 260 S.W. 261 (Tex.Civ.App.1924); *Hedden v. Schneblin*, 126 Mo.App. 478, 104 S.W. 887 (1907). In none of those cases, however, did the damages awarded allow a borrower to recover an amount as hypothetical and undelineated as in this case.[7] While the trial court cannot be faulted in its instructions on the measure of damages, because it substantially followed instructions requested by the Bank, we suggest to the parties and to the trial court that this subject should receive further attention upon remand.

The trial court in this case obviously sought to apply the legal principles limiting the scope of damages for breach of contract (e.g., in ruling out evidence as to damages from "loss of equity position in KRGS, Inc.," another separate venture in which the developers were engaged). However, we are not satisfied that the trial court fully recognized the importance of its role in assessing the "scope of the project" to determine the limits of damages to be considered by the jury,[8] even though that may have been due in no small part to the

7. Compare *Lincor Contractors, Ltd. v. Hyskell*, 39 Wash.App. 317, 692 P.2d 903 (1984), where an office complex intended to be constructed was never built because of the lender's breach of its agreement to lend construction money. The court held, in remanding for a new trial on damages, that the borrower was entitled to recover its loss of equity in the non-existent building and its lost rents from "the date of scheduled completion to the date of judgment." 692 P.2d at 907. In so doing, however, it spelled out how the "loss of equity" was to be computed:

> "Under this equity method of computation, the court can find the net gain by deducting

from the fair market value of the building on the date of scheduled completion all costs Lynnwood Pacific reasonably would have incurred in achieving the completed building, including the cost of acquiring the land and borrowing money." 692 P.2d at 908.

8. Comment *f* to § 351, Restatement (Second) of Contracts, also notes that courts may limit damages where there "is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question." See *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951 (7th Cir.), *cert. denied*, 459 U.S. 1017, 103

failure of counsel for the Bank to thoroughly focus the attention of the trial court on the subject.[9]

Because the Bank did not have a fair opportunity to address the "scope of the project" in meeting the new appraisal, and because the jury may have incorrectly measured the damages under the circumstances of this case, we conclude that we should reverse that portion of the judgment awarding damages and remand for a new trial on damages alone.

### III. *Summary*

We conclude that the Bank received a fair trial as to liability, and therefore we affirm the jury verdict as to liability.

We deem the combined verdict of $3,578,480.50 in damages excessive for the circumstances of the trial of this case. Therefore, we reverse the judgment of damages and remand for a new trial on the issue of the amount of damages alone.

ERICKSTAD, C.J., LEVINE and VANDE WALLE, JJ., and ILVEDSON, Surrogate Justice, concur.

ILVEDSON, Surrogate Justice, sitting in place of GIERKE, J., disqualified.

S.Ct. 377, 74 L.Ed.2d 511 (1982), which set aside a damage verdict of $2,100,000 because it was too disproportionate to the transaction, which involved failure to timely transmit funds of $27,000. Compare, *Markowitz & Company v. Toledo Metropolitan Housing Authority*, 608 F.2d 699 (6th Cir.1979), holding consequential damages of $925,000 suffered by a building contractor as a result of a mortgage foreclosure were recoverable following repudiation of lease agreements which were the sole source of funds to pay off the mortgage obligations for 14 duplexes constructed. Damages were not allowed for repudiation of letters of intent for 57 duplexes on which construction had not commenced before the repudiations.

9. The counsel who argued this appeal for the Bank is not the same counsel who handled the trial for the Bank.